STATE v. LOUIS POWELL AND JUNIUS PRIDGEN.

(Filed 5 November, 1914.)

**1. Homicide—Principal—Abettor—Evidence—Trials—Questions for Jury.**

Where two defendants are on trial for the same homicide, and the deed was committed by one of them in the presence of the other, either actual or constructive, who has encouraged and abetted the killing, the latter is guilty of the same degree of crime as the one whose act directly caused the homicide; and where the evidence tends to show that A. and B. had ill-will toward C.; that A. assaulted C., urged on by B., who had an open knife in his hand; whereupon C. in turn assaulted A., then left the room where the fight occurred, followed by B., with his drawn knife, and that A. attempted to follow, but was detained by a third person; that a very few minutes thereafter C. was found dead in an adjoining room from a knife cut near the region of the heart, in the presence of B., and the evidence being sufficient to sustain a verdict of the guilt of B. of murder in the second degree, it is held that it is also sufficient to sustain a verdict of guilty in the same degree against A. The principle of law relating to principals of the first and second degree in crime, and of accessories, discussed by WALKER, J.

**2. Homicide—Trials—Evidence—Continuous Transactions.**

Upon the trial for a homicide, it is held that the testimony of a witness relating the various occurrences between the prisoners and the deceased is competent as *pars rei gestæ,* they being one continuous transaction, each event being inseparable from the other.

APPEAL by defendant from *Cooke, J.,* and a jury, at June Term, 1914, of PENDER.

The defendant and Louis Powell were jointly indicted for the murder of Charles Brown, and were convicted of murder in the second degree. Charles Brown was killed at the house of Oliver Williams, who is the husband of Mary E. Williams. She testified for the State as follows: "On the night of 28 February, 1914, there was a quarrel in my house between the prisoners and the deceased. Pridgen and Powell were in the

kitchen and the deceased was in the adjoining room; Powell had a knife open in his hand; Pridgen threw a soup dish and an empty bottle at the deceased, and the latter ran into the kitchen with a chair and struck Pridgen on the head; Powell left the kitchen and the deceased followed him, and shortly thereafter, within five minutes, the deceased was lying on the floor in the house dead from a cut in the left side."

Dave Pridgen, a witness for the State, testified that he was at the house, and that Pridgen went into the kitchen; Powell followed him with a knife in his hand and said to Pridgen that he would not take it, and "Damned if I would take it, and you don't have to." This witness further testified as to what then took place, as follows: "At that time I looked around and saw Charley in the other room, coming toward the kitchen, and Junius Pridgen threw an empty bottle at Charley, but missed him, and the bottle broke to pieces against the side of the house. Charley said something and picked up a chair and came into the kitchen and hit Junius and ran out. Louis got out first and Charley was right behind him." Question by the Court: "Did I understand you to say they were running? Which was running in front and which was running after?" "Louis was ahead and Charley was right behind him. Louis had his knife in his hand. When defendant started out, I grabbed his coat-tail and he did not go out. I stayed in the kitchen a minute or two to see about Junius' head, and then went out to see where Charley and Louis were, and when I went into the south room I stumped my feet against Charley on the floor, but stepped across his body. When I called Charley, Louis spoke, saying, 'There is nothing ails him, but he is drunk,' and I reached down to lift him up and found his clothes bloody. And I said, 'Somebody bring me a light,' and Mary came with a light, and I said, 'Somebody has killed him.' I said, 'Louis, you have killed Charley,' and Louis Powell didn't say anything. I told everybody to stay in the house and sent Louis Pridgen after Mr. George Huggins, to tell him what the trouble was. I do not know anything about any fight or fuss except that part of the affair when Charley started towards Junius Pridgen, after Junius said, 'Don't a damned man touch me.'" And he further testified: "I went out of the kitchen after Charley and Louis because I had heard Louis say he would fix him, and I did not know what he would do, but did not want him to have any trouble."

Jacob Harrell, a witness for the State, testified that he held a coroner's inquest, and that the wound was as near the heart as it could possibly be.

George Huggins testified that he picked up a knife with a white handle under the fence, where the fence had fallen down, and it looked like it had been thrown under the fence. This was found on the Sunday following, in the afternoon.

Mary Williams further testified as follows: "A black-handle knife was found by the dead body of Charley Brown, that looked like the one he had in my room before he went out ahead of Charley."

Oliver Williams, the owner of the house, testified that on that afternoon, while the four men were at the house, he carried a gallon of whiskey there and all drank some of it.

Lizzie Foy, witness for the State, testified: "I was at the house the night Charley Brown was killed. All I saw was when Junius and Mary Ellen were in the kitchen, Louis went in the kitchen, and when he started Mary Ellen told him to go out, and he said he was not going to see anybody hurt Junius that night. And Charley Brown said let him alone, he would fix him. And at that time Junius said, 'Look out!' and I ran in the other room, and after I got in there I heard the bottle hit the floor. I heard Mary Ellen tell some one to go and get Oliver Williams, her husband."

There was evidence that Louis Powell admitted having had the knife with the black handle that night, and also evidence that, when it was first picked up, "the blade was bloody to the very jaws and it was wide open."

At the conclusion of the evidence the defendant Junius Pridgen moved for a judgment of nonsuit. This motion was denied, and he excepted. At his request, made in due time, the judge agreed to reduce his charge to writing, and did so, except as hereinafter indicated.

The record discloses that the court reduced its charge to writing and read it to the jury, and at its conclusion they were directed to return and make up their verdict. Counsel for the prisoner Junius Pridgen at this time requested the court orally to charge the jury that they should not consider the fact that the prisoner had not testified, to his prejudice, and the court so instructed the jury, but not in writing, and the prisoner excepted. The prisoners were convicted, and Junius Pridgen appealed to this Court, upon exceptions reserved by him.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*L. C. Grant and E. T. Burton for defendant.*

WALKER, J., after stating the case: The State did not ask for a conviction of murder in the first degree, and there is no sufficient evidence of self-defense, so that the question is, Was the prisoner guilty of either murder in the second degree or manslaughter? But the court gave the prisoner the full benefit of the plea of self-defense in the charge, and also instructed the jury fully and correctly upon the law of manslaughter, as applicable to the facts of the case. The jury were told that if the

killing with a deadly weapon had been established, the law raised a presumption of malice, and the prisoner would be guilty of murder in the second degree, nothing else appearing, and that the burden then rested upon him to show such circumstances of mitigation or excuse to the satisfaction of the jury, and not beyond a reasonable doubt, as would reduce the homicide to manslaughter or entitle him to an acquittal, explaining with sufficient fullness, as we have stated, the law as to manslaughter and self-defense.

The jury convicted both prisoners of murder in the second degree, and we must therefore inquire whether there was evidence to support the conviction, upon the motion to nonsuit. The special facts upon this point, which it is necessary to restate, are these:

Mary Ellen Williams testified: "On the night of 28 February, 1914, there was a quarrel in my house between the prisoners and the deceased. Pridgen and Powell were in the kitchen and the deceased was in an adjoining room; Powell had a knife open in his hand; Pridgen threw a soup dish and an empty bottle at the deceased, and the latter ran into the kitchen with a chair and struck Pridgen on the head; Powell left the kitchen and the deceased followed him, and shortly thereafter, within five minutes, the deceased was lying on the floor in the house dead from a cut in the left side."

It will be seen from this short statement that the prisoners, Louis Powell, who actually killed the deceased, and Junius Pridgen, the appellant, had a quarrel with Charles Brown, and were arrayed on one side as joint combatants against him, Junius Pridgen being in the beginning the more aggressive of the two. He committed the first assault upon Brown by throwing the soup dish at him, while he was standing in the other room. He evidently had ill-will and malice towards him, or there was, at least, evidence to show that he had, as they were attentive, it seems, to the same girl, and a rivalry for her affections may have caused jealousy between them, Charles Brown having said "that he wanted to talk to the lady, too." Junius Pridgen missed his mark with the soup dish, and then hurled the bottle at him, missing him again, when Charles Brown rushed upon him and struck him on the head with his chair. There was evidence that, during this mêlée, Louis Powell and Junius Pridgen were acting in concert and with a common purpose, Louis having his knife drawn ready for action if it became necessary, and immediately after Junius was hit with the chair he went out of the door, Charles Brown immediately following him, and Junius following Charles. This evidence of a concert of action between Junius Pridgen and Louis Powell and a common design to kill Charles Brown is quite strong, for Powell had his knife open in his hand, as we have said, and Junius Pridgen must have seen it and knew, no doubt, that his demeanor

toward Charles Brown had been angry and threatening, and that his purpose, therefore, was a deadly one. Nevertheless, when Powell went out with Brown in this menacing humor and hostile attitude towards him, the prisoner Junius Pridgen followed closely behind Brown to a place not far from where he was slain, and was prevented from being there "at the death" solely by the intervention of others. The evidence tended to show, also, that the fatal blow was struck just after they left the room, almost instantly, Brown being hotly pursued by Junius Pridgen to the door. A foe in front and a foe in the rear, and both envenomed against him. What a predicament! The outcome was the natural sequence from the beginning, which was brought about by the fierce assault of the prisoner, who now appeals from the verdict and judgment. He started the fight and tried to end it in the death of Brown, but by a fortuitous circumstance, not at all due to his volition, his companion in the wrong dealt the fatal blow, which nearly pierced the heart of Brown and resulted, of course, in his death. This is a fair statement of the evidence, which presents the salient facts of the case in their naked form. It would seem that no special authority or extended discussion is needed to show the guilt, in law, of the appellant. But he is entitled to have us say what law it is that condemns him, and we will proceed to determine this part of the case.

Let us premise the discussion by stating what is decided in all the cases, and especially in *S. v. Whitson,* 111 N. C., 695, that as the jury found that one of the defendants, Louis Powell, slew the deceased, under circumstances which would make him guilty of murder, any other defendant who was then and there present, aiding, encouraging, and abetting the killing, would be guilty of the same degree of crime as the man who struck the fatal blow. This is not only settled by authority, but is a truism. The law upon the subject has been thus stated: The parties to a homicide are: (1) principals in the first degree, being those whose unlawful acts or omissions cause the death of the victim, without the intervention of any responsible agent; (2) principals in the second degree, being those who are actually or constructively present at the scene of the crime, aiding and abetting therein, but not directly causing the death; (3) accessories before the fact, being those who have conspired with the actual perpetrator to commit the homicide, or some other unlawful act that would naturally result in a homicide, or who have procured, instigated, encouraged, or advised him to commit it, but who were neither actually nor constructively present when it was committed; and (4) accessories after the fact, being those who, after the commission of the homicide, knowingly aid the escape of a party thereto. In many States the distinction between principals and accessories before the fact has been abolished by statute, and those who participate are guilty as

principals. But see Revisal, secs. 3287-3290. The aiding and abetting in a murder or manslaughter may consist of help rendered to the perpetrator by the aider or abettor in the preliminary stages of the homicide, or in its commission; or of encouragement given to him by acts, words, and gestures, as by joining in a conspiracy to commit a homicide, or by hiring, instigating, inciting, advising, or counseling him to commit it, or by being privy to the homicide and countenancing it by being present at its commission, or by aiding and abetting him in any of the foregoing ways in some other unlawful act that would naturally result in a homicide if the homicide actually results therefrom. Mere presence without giving aid or encouragement at or before the commission of a homicide and without prior conspiracy, although with knowledge that the crime is to be committed, and even with approval of its commission, if that approval is not communicated to the perpetrator, does not constitute aiding and abetting. If defendant had advised the commission of a homicide or incited it, his advice or encouragement must have contributed to the deed. The aider and abettor must either act with criminal intent or he must share in the intent of the principal. One who aids and abets with full knowledge of the situation thereby adopts the criminal intent of his principal. But he adopts it only to the extent of his knowledge, or of the natural and reasonable consequences of the act encouraged by him. All who join in the common design to kill, whether in a sudden emergency or pursuant to a conspiracy, are liable for the acts of each of their accomplices in furtherance thereof. This liability attaches whether the acts were specifically contemplated or not, and although defendant did not know when or how the homicide was to be committed. The accomplices are so liable, although the conspirator who actually committed the homicide cannot be identified. There may be liability for a homicide committed in the execution of a common design, although the plan did not involve taking life. It is often said that all who aid and abet the doing of an unlawful act are liable for a homicide proximately resulting therefrom and a natural and probable consequence thereof, although not contemplated by the parties or even forbidden by defendant. Under this rule those who have aided and abetted in an abortion, burglary, robbery, grand larceny, resisting arrest with dangerous weapons, procuring and using deadly weapons in escaping from custody, breach of the peace involving personal violence and the use of deadly weapons, or assault involving danger to life as from the use of dangerous weapons, or an attack by several, have been held responsible for homicide committed by their accomplices in the furtherance of the common object. The distinction is sometimes made that if the common design is to commit a trespass or a minor offense, the accomplices are not liable for a homicide committed by the principal unless it was a plain

and direct consequence of the design; but if the common design was to commit a felony, they are liable, although the homicide results collaterally therefrom (but we need not decide this question, as it is irrelevant here). If a common design does not contemplate the commission of a homicide, and is of such a nature that a homicide will not be a natural or probable result, participation in that design is not of itself sufficient to make one liable for a homicide committed, concurrently with the execution of the common plan, by the independent act of a confederate, growing out of his private malice, or other cause having no connection with the common object, unless the accomplice was present, aiding and abetting the homicide itself. We have substantially taken this statement of the controlling principles of this case from 21 Cyc., 679-691, always seeing that it coincides with the law of this State as declared in the statutes and the decisions of this Court. Many of our cases are cited in the notes to support the text, and it would seem from the frequent reference to our cases that no court has more definitely and conclusively settled the principles applicable to this phase of the law of homicide.

The particular law which governs this case was stated by *Chief Justice Ruffin* in *S. v. Hildreth,* 31 N. C., at p. 444: "One who is present and sees that a felony is about being committed, and does in no manner interfere, does not thereby participate in the felony committed. Every person may, upon such an occasion, interfere to prevent, if he can, the perpetration of so high a crime; but he is not bound to do so at the peril, otherwise, of partaking of the guilt. It is necessary, in order to have that effect, that he should do or say something showing his consent to the felonious purpose and contributing to its execution, as an aider and abettor. Therefore, the proper instruction, in the case supposed, would have been that if the prisoner, after discovering the deadly intention of his brother, instead of preventing its execution, deterred others from preventing it, or incited his brother to go on, then he would be guilty of murder." This doctrine was again announced and applied in *S. v. Simmons,* 51 N. C., 21 (indictment for murder), as follows: "Where two persons had formed the purpose of wrongfully assailing the deceased, and one of them, in furtherance of such purpose, with a deadly weapon and without provocation, slew him, it was held that both were guilty of murder." There are many cases decided by this Court which are to the same effect. Wharton says that a person actually present, assisting to the extent of his ability in the accomplishment of a homicide, is guilty as principal in the first degree, without reference to the extent or the efficaciousness of the aid rendered by him. Wharton on Homicide (3 Ed., by Bowlin), sec. 44. It may be well here to refer to the rule as expressed in Clark's Cr. Law (2 Ed.), p. 116: "The terms 'aider and abettor' and 'accomplice' are frequently used, and the student should

understand their meaning. An abettor, as has been seen, may be either a principal in the second degree, where he is present when the crime is committed (either actually or constructively), or an accessory before the fact. An aider can only be a principal in the second degree or an accessory after the fact. An aider and abettor, therefore, is a principal in the second degree. An accomplice is any one who is concerned with another in the commission of a crime. Each person concerned is the accomplice of the other, whether he be principal in the first or second degree, or accessory before or after the fact."

There is no definition of an aider or abettor, or a principal, we may say, that does not fasten guilt, under the facts of this case, upon the prisoner, whose appeal is now before us. He and Louis Powell were the sworn antagonists of Brown; Louis Powell encouraging, by word and act, an assault upon him with deadly intent, and both acting in unison. Junius Pridgen executed his purpose as a willing coadjutor, having himself strong and resentful malice against Brown. They practically united in the first assault upon him, Junius actually striking the first blow, and immediately repeating it, under the urging of Louis Powell, and after he had been castigated by Brown he followed him in his pursuit of Louis Powell, as they both left the room, and, as the jury may well have inferred from the evidence, with the intent to assist Louis Powell in his manifest purpose of slaying the deceased.

In *S. v. David,* 49 N. C., 354, *Judge Manly* thus stated the rule, in his charge to the jury, which was approved by this Court and prevails to this day: "Such is the law in respect to the principal actor in the commission of this homicide. The rule with respect to the principals in the second degree is that all persons who are present at the commission of the crime, aiding and abetting its commission, are guilty also. An intention to kill is not necessarily involved in a criminal homicide. A purpose to assist another with violence, and under circumstances that must necessarily result in death, or some great bodily hurt, is sufficient to characterize a killing thus occurring as murder. If, therefore, David, when he approached the deceased, intended to assist the woman in resisting him, and to do so by violence, if needful, reckless of the consequences, he also would be guilty of the blow struck by the woman in the prosecution of the purpose, and will be guilty of murder. But if no such purpose was entertained by David at the time he advanced upon the deceased—if, in other words, he was not present as an aider and abettor, he would not be guilty. A common purpose or intent was requisite, but it was not necessary that the purpose or intent should be preconceived for any particular length of time; it is sufficient if it had been formed, and was entertained and acted on at the time of the fatal blow." It is almost needless to say that *Judge Pearson,* after a brief but conclusive statement of the

law, showed by convincing reasoning, without reference to his citations, that *Judge Manly* correctly charged the jury in that case.

It may truly be said that presence at the time the homicidal deed is done is essential to make one a principal, even in the second degree, as generally understood; but this presence may be actual or constructive. The participant need not be an eye and ear witness of the homicide. Clark's Cr. Law (2 Ed.), p. 102. "A person, if present, must be a principal, if guilty at all. He cannot be an accessory, for, as we shall see, absence is essential to make one an accessory." Clark's Cr. Law (2 Ed.), p. 103. The writer says, at p. 105: "There must also be a community of unlawful purpose at the time the act is committed. Acts done by one of a party, but not in pursuance of the arrangement, will not render the others liable as principals. Thus, if two persons start out to commit a burglary or robbery, and on the way one of them kills a man, or sets fire to a house, or, in escaping, one of them maims or kills an officer or other persons, to prevent being taken, the other, not having contemplated such an act, is not a principal. It would be otherwise, though, if the act done were a probable consequence of the execution of the common unlawful purpose. Thus, where two persons start out to commit a burglary or robbery, and, encountering resistance from the owner of the house or person to be robbed, one of them kills him, the other is a principal in the murder. So, also, where several persons start out to beat a man, and one of them kills him, they are all principals." It is useless to cite more authorities for so plain a proposition.

The difficulty always is in applying a particular doctrine of the law to given facts. But we have no such embarrassment here. This was a "running fight," in which the prisoner Junius Pridgen opened the battle by a fierce attack upon his adversary, Charles Brown, first by hurling the dish at him, and, failing in this assault, he again attacked him with a bottle, breaking it against the wall, and being assaulted by the common adversary of himself and Louis Powell with a chair, which temporarily disabled him, he recovered and joined with Powell (who led the way) in what the jury may have found was a third assault upon Brown, which they contemplated at the time, and which finally, but in a very short while, was consummated by a fatal stab to the heart. The case of *S. v. Price,* 158 N. C., 641, is substantially like this case, as to the feature of it.

Some of the remaining exceptions are very general, and the points intended to be raised have frequently been decided against the appellant's contention. If his Honor fell short of giving all the law of the case in his charge, the defendant should have called attention to the shortcomings of the court by a request for special instructions. *Simmons v. Davenport,* 140 N. C., 407; *S. v. Yellowday,* 152 N. C., 793. A party

cannot "lie by" and await the verdict of the jury, taking his chances thereon, and afterwards complain that the charge of the court was not as full, or as explicit, or as comprehensive as it might have been, unless by special prayers its alleged defects have, in due time, been brought to its attention, so that they may then be cured. *S. v. Tyson,* 133 N. C., 692.

Our conclusion is that, on any view of the facts, considered in the light of the general and well settled law and our decisions in particular, the verdict and judgment were well warranted by the evidence, and the nonsuit was properly denied.

The prisoner mainly relied upon his motion to nonsuit, but reserved a few minor exceptions. It was entirely proper to hear the testimony of the witness Mary E. Williams as to the matters that occurred at her house. It was all one continuous transaction, each event being inseparable from the others, and competent as *pars rei gestæ.*

The prisoner requested the court to instruct the jury that the fact of his not taking the witness stand in his own behalf should not be taken against him. This was a proper request, but it appears that it was made orally, after the court had given its charge in writing, at the request of the prisoner, and was granted as a matter of favor, and the court, in responding favorably but orally to the request, complied with the spirit of the statute. A party cannot take advantage of his own wrong. If he wanted it to be written, he could have asked for such an instruction in apt time. The case of *S. v. Dewey,* 139 N. C., 556, answers this objection fully and conclusively, and no further comment is required, except that the prisoner was asking a favor of the court, after it had fully performed its function of charging the jury, and it does not come with good grace from him to object, because in granting it, according to the very terms of the request and without the slightest prejudice to him, the court failed to write it out. The exception, under the circumstances, is without merit. Trials are too serious in their consequences to be thwarted by such slight departures from the usual form, if such were the case here, and we have seen that it is not. The prisoner has no ground of complaint, as the State treated him with great leniency. There was ample evidence to warrant a conviction of murder in the first degree. The other exceptions are formal, and of course without any real merit.

We have reviewed the case at some length, because of its importance, and cannot sustain the exceptions.

No error.