[No. 2945.   March 10, 1925]

STATE v. SMITH et al.

### SYLLABUS BY THE COURT

1.  Alleged errors not discussed in the briefs of appellants will be deemed waived and abandoned.

2.  It was not error to admit evidence of the actions of appellants in assaulting the jailer of the Torrance county jail; the jury being properly instructed as to the proper consideration to be given to such evidence.

3.  Severance of trial of two or more defendants jointly court, and his action will not be renewed by this court, unless such discretion is abused.

4.  Instruction relative to statements made by defendants examined, and **HELD** not prejudicial.

5.  When an instruction contains a term alleged to be misleading, it is the duty of the party complaining, to request a special instruction defining the term. Instruction examined and **HELD** not erroneous, and that in any event appellants not in a position to complain in default of proper requests for explanatory instruction and in absence of proper exception.

6.  There was no error in instruction No. 8; the same being clear when considered with attending instructions.

7.  The court properly refused appellants' tendered instruction No. 3 as having been covered by other instructions.

Appeal from District Court, Valencia County; Owen, Judge.

Bernard Young Smith and Mack Clyde McCulley were convicted of second degree murder, and they appeal. Affirmed.

E. P. Davies, of Santa Fe, for appellants.

Milton J. Helmick, Atty. Gen., and J. W. Armstrong, Asst. Atty. Gen., for the State.

OPINION OF THE COURT

BICKLEY, J. This case arose in the district court of Valencia county, N. M., by reason of the finding and filing therein of an indictment by the grand jury at the September term, 1923, of the district court thereof, against Bernard Young Smith and Mack Clyde McCulley, wherein the said Smith and McCulley were charged with having unlawfully, feloniously, wilfully, deliberately, premeditatedly, of their malice aforethought, killed and murdered one William R. Carman. To this indictment the defendants and each of them pleaded not guilty, and upon this issue the cause proceeded to trial in said court on September 10, 1923, and resulted in a verdict of guilty of second degree murder being returned against each of the defendants, and upon which judgment and sentence of the court was entered by the provisions of which the said Smith was sentenced to a term of not less than 35 years nor more than 45 years in the state penitentiary, and the said McCulley was sentenced to a term of not less than 25 years nor more than 35 years in the state penitentiary. A motion for a new trial was filed and presented to the court by each of the defendants, and was overruled by the court. An appeal was then taken to this court, and the cause is now here for review upon the various exceptions to actions and rulings of the trial court.

On or about the 27th day of April, 1923, in Valencia county, N. M., the dead body of one William R. Carman was found in an empty coal car attached to a freight train of the Santa Fe Railroad when the said

freight train took a siding at a station known as Grants at about 9:40 a. m. on that day. The defendant Mc-Culley was subsequently arrested in Phoenix, Ariz., charged with the murder of the said Carman, and admitted that he was on the train just before the time Carman was killed and in the coal car where the body was found, with the defendant Smith; that he was in one end of the car and Smith in the other; that the deceased Carman came over the top of the car and said: "You sons of bitches, get off," and that he proceeded forthwith to get off the car; that he was not present when the fatal shot which produced the death of said Carman was fired, but that he was subsequently told by Smith that he (Smith) shot Carman for the reason that Carman was about to take his (Smith's) life, and it became necessary for Smith to protect his own life. Smith was arrested on the 30th day of April, 1923, near Bluewater, N. M., and at the time of his arrest there was taken from his person a 38-caliber Colt revolver, a small caliber automatic, and a belt of cartridges. Prior to his arrest, after the killing, Smith had a gun fight with officers who tried to apprehend him. When asked why he shot Carman, Smith replied: "He struck me with a club on the leg." When the dead body of Carman was found, there was a bullet hole two inches above the right nipple and a gunshot wound on the left hand. Near the body was also found a club. It was shown by medical testimony that the bullet wound in the breast of the deceased was such a wound as could and did produce his death. The evidence further showed that Smith and McCulley had been previously incarcerated in the Torrance county jail on charges of varying degrees of gravity, and had escaped with one Mike Bender after holding up the jailer and tying him in the jail. Upon the trial of the cause, Smith testified; his testimony being practically the same as had been previously stated to the state's witnesses by him. McCulley denied, in his statements to various parties, being present at the time of the shooting. Smith admitted that he fired the shot that killed Carman, but contended that it was

done in self-defense to protect himself from Carman's apparent attempt to take Smith's life. He denied that McCulley had anything to do with the killing, and corroborated McCulley's extrajudicial statements in this regard.

The foregoing statement is the most favorable which can be made from the viewpoint of the appellants, and is taken very largely from the statement of the facts made in appellant's brief.

A more detailed statement of the facts, as the jury might have concluded them to be, would show that Smith and McCulley, being both legally incarcerated in the county jail at Estancia, N. M., overpowered the jailer and, taking his guns and ammunition from the jail, made their escape. The circumstances of the jail delivery would indicate a desperate frame of mind in the appellants and that they were not overly sensitive about using a substantial degree of force to accomplish their objects. The appellant McCulley, having been permitted to remain outside of his cell in the jailer's room for a short time, upon being conducted back to his cell, said: "Wait a minute; I have forgotten my tobacco." While there he took the jailer's gun, and on his return threw the gun in the jailer's face and told him to get in the cell. Mike Bender, another prisoner, came out about this time, and he and appellant McCulley choked the jailer down. Appellant Smith came out of the cell about that time, and took the gun from appellant McCulley. Appellant McCulley was twisting the jailer's arms behind him, so that it was impossible for the jailer to get loose. The persons attacking the jailer told him that it would not be best for him to make any noise. Appellants took the jailer to a cell, tied his feet together, threw him to the floor, ran his hands through the bars of the cell behind him and tied them on the outside. Appellants then demanded the guns in the jail and took the keys from the cell door and left to get the guns from the office of the jail. When appellant McCulley stuck his gun in the jailer's face, he told the jailer to get into

the cell and see how he liked it there. He had the pistol cocked and drawn on the jailer at the time he told him to get inside the cell. This gun was a 38 Colt army special, apparently the gun with which Carman was killed. Appellant Smith took this gun away from appellant McCulley, saying that he would feel safer with it. The appellant Smith said that they could not leave the jail without guns, and told the jailer he would give him a very short time to tell him where the guns were. When Smith told the jailer this, he was standing on the outside of the cell to the jailer's back with a gun pressed in the back part of his head. The muzzle of the gun was against the jailer's head. The appellants told him to hurry up and tell where the guns were, and then went to the sheriff's office. The jailer saw nothing more of the appellants, and remained bound in the manner described for about two hours. After the jailer had been released, he made an inspection of the sheriff's office and of the desk drawer where the guns had been kept, and found that this drawer had been taken out and was resting upon the floor, and that all the guns were missing. In this drawer there had been a Colt .380 automatic, a 32-20 Colt on a 45 frame, a 44 Colt double action, and an old 45 Colt. These were in addition to the jailer's gun which they had obtained prior to the occurrence described, and with which appellant McCulley held up the jailer. This latter gun, together with the holster and belt of cartridges for same, was carried away. Five guns in all were taken, as was also about 200 rounds of ammunition. Smith had two guns when arrested, one which he had taken from the deceased after killing him. This gun of the deceased had not been fired. The 38-Caliber Colt described as State Exhibit C is the one appellant McCulley took from the jailer's quarters and the one he used on the jailer, and is doubtless the one which inflicted the mortal wound upon Carman. The 32-20 Colt was also identified as one of the guns taken from the Estancia jail by appellants. This 32-20 Colt was apparently the one which was hidden and abandoned by McCulley on a hill near the

scene of the homicide after the killing had taken place. The jailer's 38 Colt shot a Winchester 38 special leaden bullet. Both Smith and McCulley held revolvers in the proximity of the jailer's face and head during the jail delivery.

The deceased, William R. Carman, was a brakeman in the employ of the Santa Fe Railway Company, and was in the discharge of his duty as such brakeman on the freight train which left Belen for Gallup at 4:20 o'clock on the morning of April 27, 1923. The train was composed of 85 cars—coal, refrigerator, and flat cars. The position of the deceased brakeman was near the rear of the train. He was in the discharge of his duties, which included dealing properly with hoboes stealing rides on trains. The train stopped at Wall, which is near milepost 58, which indicated that it was located 58 miles from Albuquerque. The train left Wall at 7:40 o'clock a. m. The deceased was in the caboose when the train stopped at Wall. At Quirk near milepost 64 is an extra track for passenger trains. About two miles west of Quirk two men, said to have been appellants, were seen near milepost 66 about 100 yards south of the railroad track, sitting behind a small cedar bush. The train reached Grants, which is west of milepost 66, about 9:40 o'clock a. m., taking the siding there. It being discovered that the deceased Carman did not perform his usual duties upon taking the siding, a search of the train was made, and the deceased was found in an empty coal car 32 cars ahead of the caboose. Carman was dead when his body was discovered. The body of Carman had apparently not been disturbed. It was lying approximately 8 feet from the west end of the car; the car being about thirty-six feet in length. The body was on the north side of the car, the feet being almost against the north side thereof. It was lying on its left side, face toward the west, with the right arm with the hand clenched right in front of and west of the face; the left and and arm extending back of the body. There was a pool of blood about 6 inches in diameter which had apparently come from

the deceased's mouth, which was lying close to the floor of the car. The car floor was wooden, and the pool of blood was over a crack in the floor. There was a brake stick about 2⅛ feet long, which had been carried by the deceased, found near his body; also a pair of gloves belonging to the deceased were found nearby on the floor of the car. Blood stains were found on the railroad track near milepost 66 and were followed on the railroad track to a point west of milepost 66. There were no eyewitnesses to the homicide except the appellant Smith, so far as the direct testimony shows.

The facts heretofore stated comprise in the main the narrative of what occurred. There are many other statements of facts and circumstances which doubtless had a bearing upon the verdict of the jury.

The appellant Smith endeavors to assume all of the blame for the shooting, and says that he acted in self-defense. He says that he fired the only shot which was fired at the deceased. Seeming to contradict this is the fact that the deceased suffered two wounds— one in the breast and one in the fingers of the left hand. A medical expert testifying on behalf of appellants said that a leaden bullet from a 38 caliber Colt revolver passing through the fingers would break and shatter the bones. It is true that this witness also stated that, in his opinion, any bullet passing through the fingers of the deceased would have shattered the bones. There is, however, testimony of witnesses, medical experts, and otherwise, describing the gunshot wounds found upon deceased—one in the breast which caused the death of deceased, and the others found in the three fingers of the left hand. One of the fingers was completely penetrated, evidently by a ball of small caliber, apparently so because the points of entrance and exit were quite small and apparently the same size. One witness expressed the opinion that the wound in the finger was caused by a 25 or 30 caliber bullet; the wound in the fingers being much smaller than the wound in the breast. One of

the fingers was drilled straight through; that is, the bone of the finger was drilled through like the opening had been made with a drill. It was not shattered. Another witness for the state probed the hole in the finger of deceased with a lead pencil and found that the bone was penetrated with a clear hole, with practically no shattering of the bone, and testified that the hole through the finger was made by a smaller bullet than the hole in the breast. The testimony concerning the wounds in the fingers of the deceased is important because it was the duty of the jury to consider all of the facts and circumstances as elicited by the testimony in determining whether the appellant McCulley was present at the homicide aiding, encouraging, and abetting the appellant Smith, who admits having fired the fatal shot. It seems to be the endeavor of appellants in their brief to rely upon Smith's statement as to having fired the fatal shot. It is there said:

"As to who fired the fatal bullet which resulted in the death of the unfortunate Carman, we have no testimony save that of the defendant, Bernard Young Smith. His testimony as to who fired the shot which killed Carman is corroborated by the record in several particulars.

It is argued in the brief of appellants that there is not sufficient testimony to show that McCulley, in conspiracy with Smith, had formed a design to kill Carman. Of course, if McCulley and Smith, when breaking jail and endeavoring to escape, had formed a design to kill any one who should obstruct their attempts at escape and pursuant to that intention, one of them fired the fatal shot, the other only passively acquiescing, they would both be equally guilty. On the other hand, it is strongly argued by counsel for appellants that a conspiracy to escape from the jail, unless it went so far as to embrace the intent to take human life in aid of such escape, would not justify the jury in finding both the appellants guilty, where only one of the appellants had fired the fatal shot, in the absence of testimony showing the formation of a conspiracy between the two to take human life.

The extent to which a design once formed in a

conspiracy between persons to commit an unlawful act
may bind all of the participants when the exigencies
of the case impel one of the number to commit a dif-
ferent and separate crime, seemingly following in
natural sequence upon the commission of the original
crime, is the subject of much argument and speculation
and it would be more important in this case, and would
require a much closer scrutiny upon our part, were
the verdict of the jury dependent alone upon testimony
relative to the conspiracy to escape jail and subse-
quently to escape rearrest, and to what extent McCul-
ley might have acquiesced and approved of the vio-
lent acts of Smith, assuming that said Smith was the
only one who fired a shot at the deceased.    Where,
however, the testimony as stated above, together with
many other facts and circumstances heretofore and
hereafter pointed out, indicate that the jury may have
not unreasonably disbelieved Smith's testimony about
his being the only one who fired a shot, and the jury
may have reasonably believed that the wounds made
in the fingers of the deceased were made from a pistol
in the hands of the appellant McCulley, in which event
the question of conspiracy becomes of less importance
because, if the jury believed    that    McCulley    was
actively participating in the events leading up to the
death of Carman, then it is not necessary to speculate
as to his frame of mind concerning the extent to which
he approved of Smith's actions or constructively par-
ticipated therein.

There are other circumstances which cast discredit
upon the story of Smith that he fired the only shot
which was fired and also descredit the plea that Mc-
Culley had withdrawn from the scene before the shoot-
ing commenced.    We will note some of the more promi-
nent of these circumstances.    McCulley traded off his
mackinaw for a different sort of a garment; he had
a revolver and threw it away after the killing of Car-
man, according to Smith; McCulley said he hid a gun
and some other articles on the mountain side near the
scene of the tragedy.    McCulley stated to witnesses
that he jumped off of the train before Smith fired

the shot which killed Carman, and that he knew nothing about it until after Smith told him of what had occurred. McCulley told witnesses that he jumped off of the the car that he was riding at the cement apron near a bridge. Testimony showed that this cement apron is at or near milepost 63, about three miles from the place of the tragedy. On the other hand, Smith testified that when he got off of the car after killing the deceased Carman, he saw McCulley on the ground five or six car lengths back from where he (Smith) got off. When it is considered that the train was moving and that Smith, after killing Carman, had stopped long enough to watch him for a short time and then take Carman's revolver before getting off the train, it may be readily understood that the jury concluded that they both got off very nearly at the same time. Smith testified that the events from the time Carman spoke to him till the fatal shot was fired did not occupy more than two minutes. At the speed the train was moving at that point, it would have gone about forty-four car lengths in two minutes. There is other testimony of witnesses to the effect that near milepost 66, where the blood stains were first seen on the railroad track, there were well-defined foot tracks on the ground at the side of the track made in such a manner as to indicate that two men had jumped off of the moving train. These two sets of tracks were about 75 feet apart, and went off to the side of the track and converged where the parties had apparently proceeded together to a point where a witness says he saw them together by a small tree. McCulley said that, when Carman came over the end of the coal car, Smith was sitting down in the east end of the car. Smith says they were in the west end. The body of Carman was found in the west end of the car. There were many other discrepancies of statement of Smith and McCulley, from which the jury might view with suspicion the exculpatory statements which each of them made.

[1] Counsel for appellants requests an examination of the record by this court to ascertain whether all of

the errors alleged to have been committed by the trial court were in fact such. We will consider only those alleged errors which have been discussed in appellants' brief. State v. Luttrell, 28 N. M. 393, 212 P. 739.

As we understand appellants' contentions, it is claimed:

1. There is no sufficient evidence to support the verdict of the jury as to the appellant McCulley. From the statement of facts heretofore made and other facts in the record, the jury could have believed that the appellant McCulley, about three days prior to the killing of Carman, had broken jail at Estancia, and in doing so disarmed the jailer and assaulted him with a deadly weapon, and by violent means secured the jailer in a cell, robbed the jail of all guns and of considerable ammunition, and fled from justice; that, constantly in flight with his associate in the escape enterprise, he was apprehended, while riding on a freight train, by deceased, the brakeman Carman, who was advised of the jail delivery and a description of the persons escaping, and who, at the time of the fatal encounter, was in the performance of his duties; that he saw Carman first and gave an alarm or warning to his companion Smith; that, in order to make good their escape both he and Smith shot deceased, one of the shots killing Carman; that he and Smith continued their flight, hiding one of the guns they had been carrying, and also hiding other articles which might identify them, and further sought concealment by disguise. So far as the verdict of the jury is concerned, it must stand, unless errors of law were committed by the trial court. State v. Whitener, 25 N. M. 20, 175 P. 870; State v. Jaramillo, 25 N. M. 228, 180 P. 286; State v. Wilson, 25 N. M. 439, 184 P. 531; State v. Luttrell, 28 N. M. 393, 212 P. 739.

The court particularly cautioned the jury as to the contention of McCulley that he was not present when Carman was killed, using the following language:

"You are instructed that, before you would have a right to convict the said defendant Mack Clyde McCulley, you

would have to find from the evidence beyond a reasonable doubt that the said Mack Clyde McCulley was present, aiding abetting, or assisting the said defendant, Bernard Young Smith, at the time of the shooting of the said William R. Carman by the said defendant Smith, or if you have a reasonable doubt as to whether the said defendant Mack Clyde McCulley was present, aiding, abetting and assisting the said defendant Smith at the time of the said shooting, then you should find the defendant Mack Clyde McCulley not guilty."

**[2]** 2. There is a claim that the trial court erred in admitting evidence of the incarceration of appellants in the Torrance county jail, and of their subsequent violent actions toward the jailer and the theft of the pistols and ammunition from the jail, and their escape therefrom.

We think the court committed no error in admitting this testimony. In the case of State v. Starr, 24 N. M. 180, 173 P. 674, this court had under consideration a similar contention to that made by the appellants here, and in that case we said:

"This rule is not without exceptions. A leading case in in which a number of exceptions are treated is People v. Molineux, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193, to which is appended a case note in which numerous cases are collected. The rule upon the subject is set out in the case note in the following language: 'It is a general rule of criminal evidence that, on the trial of a person accused of crime, proof of a distinct, independent offense is inadmissible.'

"As pointed out in the Molineux case, exceptions to the general rule referred to cannot be stated with catagorical precision. Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish: (1) Motive: (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan, embracing the commission of two or more crimes so related to each other that the proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial. In the instant case it is contended by the state that the trial court permitted the introduction of testimony relative to the transactions in and around the jail pertaining to the escape upon the theory that this evidence tended to show a motive for the homicide. It is argued that the appellants conspired together to make their escape, and secured arms and ammunition to prevent their recapture, and, if necessary, to take life in order to prevent being brought back to the jail."

In the later case of State v. Smith, 24 N. M. 405,

174 P. 740, we referred to the Starr Case, and other-
wise referred to the principles therein discussed, as
follows:

"The third point urged is that the court committed error
in permitting the state to put in evidence the commitments
under which the appellant and those jointly indicted with
him were arrested and placed in the county jail of Luna
county, and also that error was committed in permitting the
state to put in evidence the jail records of such county, show-
ing the fact that the defendant and the others named were
incarcerated in such county jail at the time and prior to their
escape therefrom.   The objection urged to this evidence is
that it tended to show that the parties had committed a crime
other than that for which they were being tried, and that
proof of such other independent crime was prejudicial to
them.   Appellant contends that under the rule laid down in
the case of State v. Starr, supra, not yet officially reported,
the evidence here in question was clearly improper, because
the court in its twenty-fourth instruction told the jury that
such committments and jail records were admitted in evidence
for the purpose of showing, if they did show, the legality of
the detention and incarceration of the prisoners named in
such committments, in the Luna county jail.   The evidence
was clearly admissible upon several distinct grounds.   It
was properly received, as stated by the court,, for the purpose
of showing that the parties who broke jail and subsequently
killed the sheriff who pursued them, were legally incarcerated
therein.   If such was the fact, the sheriff had the right to
pursue and recapture them, and, if they resisted arrest with
knowledge of the purpose of the sheriff and his deputies and
slew the sheriff for the purpose of evading recapture, they
would be guilty of murder in the first degree.   An escaped
prisoner who is either convicted or held for trial under a
warrant, fair on its face, who shoots an officer attempting to
recapture him is guilty of murder.   The status of the de-
fendant would have been quite different had he and his con-
spirators been illegally held as prisoners in the Luna county
jail. It was proper for the state to show that they were
legally  confined in the jail, and for this purpose the com-
mittments were proper evidence.   Such evidence was also
admissible for the purpose of showing motive on the part of
the defendant and his conspirators in slaying the officer at-
tempting to arrest them.   The fact that they were in prison
awaiting trial on felony charges furnished a strong motive for
their slaying of the officer who was attempting to rearrest
them and hold them for trial."

While both of the appellants in the case at bar were
not in jail on felony charges, they would have been
liable to prosecution for felonies on account of their
actions in breaking jail and assaulting the jailer with
deadly weapons.   The jury was instructed as to the

proper consideration to be given to this evidence complained of.

[**3**] 3.   It is contended by the appellants that the trial court abused its discretion in refusing to grant appellant McCulley's motion for a severance.   We have examined the record with this point in mind and in view of the ruling of this court in State v. Mc-Daniels, 27 N. M. 159, 196 P. 177, and other New Mexico decisions, we find no error in the court's refusal of a severance.

[**4**] 4.   Appellant Smith complains of instruction No. 29 given by the court, which is as follows:

"There have been introduced before you statements purporting to have been made by the defendant Bernard Young Smith at the time he was being detained for investigation or in custody.   It is for you to determine beyond a reasonable doubt whether such statements were made. and the court charges you that, if you believe from the evidence that such statements were made, you may not consider them in any respect as bearing upon the guilt or   innocence  'of   defendant, Mack Clyde McCulley And you are further instructed as to nay statements in evidence' before you purporting to have been made by defendant Mack Clyde McCulley at the time he was being detained for investigation or in custody.   It is for you to determine beyond a reasonable doubt whether such statements were made, and I charge you that, if you believe from the evidence that such statements were made, you may not consider them in any respect bearing upon the guilt or innocence of the defendant Bernard Young Smith; but such statements of either the defendant Smith or McCulley will not be given any weight by you whatever, if you believe from the evidence or entertain any reasonable doubt from the evidence that the statements were not made freely and voluntarily, or that they were induced by force, threat, or 'coercion or any external influence that operated to deprive them of freedom."

This instruction was not prejudicial to the defendants or either of them.   It is not claimed that the statements made by appellants were not entirely voluntary, but that in some way the instruction deprived the jury of the right to consider any exculpatory portions of the statements.   Appellants were not denied the opportunity to explain any statements said to have been made by them, and we are unable to see in this instruction the fault urged by appellant.

[**5**]    5.    Instruction No. 25 given by the court, was as follows:

"A defense interposed by the defendant Bernard Young Smith is that of self-defense.    You are instructed that the rule of law on the subject of self-defense is this: Where a person in the pursuit of his affairs is assaulted, and when from the nature of the assault there is reasonable ground to believe that there is a design to take his life, or to do him great bodily harm, or to perpetrate any felony upon him, and the party attacked does so believe, then the killing of the assailant under such circumstances would be excusable or justifiable, although it should afterwards appear that no injury was intended and no reasonable danger existed.    It is enough that there be an apparent danger; such an appearance as would induce a reasonable person in the defendant's position to believe that he was in immediate danger of great bodily harm.    Upon such appearance a party may act with safety, nor will he be held accountable, though it should afterwards appear that the indications were wholly fallacious, and that he was in no actual peril.

"The rule in such case is this: What would a reasonable person, a person of ordinary caution, judgment, and observation, in the position of the defendant, seeing what he saw, and knowing what he knew, suppose from this situation and these surroundings?    If such reasonable person so placed would have been justified in believing himself in imminent danger, then the defendant would have been justified in believing himself in such peril, and in acting upon such appearances. And, in considering whether the shooting, if there was a shooting, was justifiable on the ground that the shooting was in self-defense, you should consider all the circumstances attending the shooting, the character of the wound, and the conduct of the parties at the time and immediately prior thereto, and whether or not the deceased was armed and made such a hostile demonstration as would justify a reasonably prudent man in apprehending that he was in imminent danger of losing his life or of suffering great bodily harm, or of a felony being committed upon him, and the degree and nature of the force used by the defendant in making what is claimed to be self-defense, as bearing upon the question of whether the shooting was actually done in self-defense, or whether it was done in carrying out an unlawful purpose.

"But the law of self-defense does not imply the right of attack, nor will it permit acts done in retaliation or for revenge. And if you believe from the evidence, beyond a reasonable doubt, that the defndant sought, brought on or voluntered into a difficulty with the deceased for the purpose of wreaking vengeance upon the deceased, or for the purpose of engaging him in a conflict wtih deadly weapons, then the defendant cannot avail himself of the law of self-defense, and you should not acquit him on that ground.    And it is for you to determine from the evidence whether the claim that the deceased was killed in self-defense is made in good

faith, or is a mere pretense. In determining who provoked or commenced the difficulty, or made the first assault, you should take into consideration all the facts and circumstances in evidence before you."

Appellants excepted to this instruction, "for the reason that the same does not clearly show or contain the doctrine of self-defense, as is correctly and clearly contained in the instruction requested by the defendant upon the same subject, in that it injects into and makes a part of said instruction the alleged essential of the person invoking the doctrine of self-defense be engaged "in the lawful pursuit of his business.'" Counsel for appellants says that "affairs," as used in the instruction, is synonymous with "business," and argues that this language in the instruction limits the right of self-defense to a person in the pursuit of his own business. We apprehend that a person may be in pursuit of his affairs, whether bent on pleasure or business, and that the phrase would exclude only those occupations or pursuits as are unlawful in contemplation of the immediate transaction under investigation. Nothing appears in the record to show that the jury was charged that the circumstances of riding or being upon the train at the time of the homicide was in itself alone unlawful.

We think the phrase complained of and similar phrases in instructions on self-defense are meaningless and unnecessary, and might well be dispensed with. However, the appellants were not prejudiced thereby, and, if they were, they were not in a position to complain. The court very clearly told the jury in instruction No. 30 that, so far as the evidence showing the commission of certain acts by the two defendants at the Torrance county jail, and at times and places prior to and other than on the train between Wall and Laguna when the death of Carman was alleged to have taken place, they were to consider such evidence solely for the purpose of determining whether such evidence tended to show the identity of the person alleged to have committed the offense, the identity of the weapon used, and whether defendants were together and acting

in concert at the time of the alleged homicide, and in determining the motives of the defendants and who commenced the difficulty. The court instructed the jury that the defendants were clothed with a presumption of innocence, and that this presumption stood as their protection until it should be removed by facts establishing their guilt beyond a reasonable doubt. In view of these charges and the conduct of the trial as a whole, we are unable to see how the jury could have been misled into thinking that the phrase in instruction No. 25, ''in the pursuit of his affairs,'' was a limitation on the right of self-defense as defined in said instruction.

We say that the appellants are not in a position to complain, because it is a well-settled rule that, if a party to an action believes that a term used by the court in an instruction should be defined and explained, a special instruction should be requested defining the term, and the use of terms claimed to be misleading will not operate to reverse in the absence of requests to define or explain them. 38 Cyc. 1688.

"A general objection to an instruction is not sufficient to call the court's attention to the fact that a word used in the instruction should be defined. If defendant wanted this term defined, he should have prepared an instruction properly defining it and asked the court to give it to the jury. Having failed to do so, he cannot now complain." Kirby v. Lower, 139 Mo. App. 677, 124 S. W. 34.

Merely presenting another instruction on self-defense with the words complained of omitted was not a sufficient compliance with the rule. If the appellants thought the phrase, ''in the pursuit of his affairs,'' was misleading, they should have requested the court to define the words and phrases presenting such an explanatory instruction. This they did not do.

It will also be noted that the exception to instruction No. 25, found at page 277 of the transcript, is not an exception to the language used in instruction No. 25. The language used in the instruction was ''in the pursuit of his affairs,'' whereas the exception complains of the use of the words, ''in the lawful pursuit of his business.'' Whether the words used in the exception

were originally in the instruction and were changed
so that the word "lawful" was stricken out and the
word "business" changed to "affairs" so as to meet
the objection of appellants we are not advised. If
such was the case, it was then the duty of appellants to
except to the language as changed, if it was still ob-
jectionable. This was not done. On the other hand, if
the exception was made to language which did not
appear in the instruction in the first place, then the
court would have been warranted in ignoring the ex-
ception.

[6] 6. The appellants excepted to instruction No.
8 on the ground that it did not clearly limit the same
to the offense of murder being then tried as being com-
mitted in the execution of a common design. In in-
struction No. 8, the court does lay down general prin-
ciples, but the next instruction, No. 9, which is very
evidently a continuation of the matters treated in in-
struction No. 8, fully ties the discussion into the im-
mediate charge of murder being tried, and no one
reading the two together would conclude that the
court was referring to any other transaction. Said
instructions Nos. 8 and 9 are as follows:

"8. The court charges you that persons who are the imme-
diate and actual perpetrators of an act are what is known
in law as principals, and any person who is guilty of acting
with the actual perpetrator in the commission of an offense
is likewise a principal. When an offense has been actually
committed by one or more persons, the true test for determ-
ining who are principals, is: Did the parties act together in
the commission of the offense? Was the act done in the
pursuance of a common intent and in pursuance of a previous-
ly formed design in which the minds of both defendants
united and concurred? If so, then the law is that each is
alike guilty, providing the offense was actually committed
during the existence and in the execution of a common design
and intent on both.

"9. And so, if you believe from the evidence beyond a
reasonable doubt that one of the defendants actually fired
the fatal shot which killed the deceased, and that the other
defendant was then and there present, aiding, abetting, en-
couraging, and requesting the commission of the crime, and
that such act was done in pursuance of a common design and
purpose between the defendant whom you may believe fired
the fatal shot and the other defendant, then you are in-

structed that each defendant under such circumstances will be equally guilty."

[**7**]    7. Appellants objected to the action of the court in refusing instruction No. 3 tendered by the defendants, for the reason that the same contained a correct statement of the law applicable, and that no instruction given by the court adequately covered the ground covered by the proposed instruction. The court refused this tendered instruction as being covered by other instructions. The argument of appellants is that the instruction given by the court was abjectionable, because it added an additional element to the law of self-defense, viz, limiting it to a person in pursuit of his affairs.. This objection to the instruction given we have disposed of, and we find no error in the refusal of the court to give instruction No.' 3 tendered by the defendants.

We have carefully read the entire record, and have come to the conclusion that the defendants had a fair trial, and that there is no ground for reversal in the case. The judgment of the lower court is therefore affirmed and it is so ordered.

PARKER, C. J., and WATSON, J., concur.