STATE v. HUGH ALLISON.

(Filed 27 January, 1931.)

1. **Criminal Law C a—Party who is present and aids, abets or encourages commission of crime is guilty as a principal.**

   One who is present and by his presence and conduct aids, abets or encourages another in committing a crime is a principal in the second degree and is equally guilty with the perpetrator, there being no practical difference between principals in the first and second degree, and the law relating to accessories before and after the fact has no application.

2. **Same—Evidence in this case held sufficient to convict defendant as a principal in the second degree.**

   Evidence that the defendant drove the perpetrator of the crime in his car passed the deceased with whom they had both quarreled, and that the perpetrator shot and killed the deceased, and that the defendant and the perpetrator had acted in concert and that both were armed with pistols, and that defendant, as they left the scene of the homicide was

heard to remark "we killed a man and must get away from here": is *held* sufficient to sustain a conviction of the defendant as a principal in the second degree.

**3. Homicide G b—Instruction as to burden of proof held not erroneous in this case.**

> Where there is evidence sufficient to convict the prisoner of the crime of manslaughter as an aider and abettor of the actual perpetrator, and there is evidence that the killing was done with a deadly weapon: *Held,* an instruction is not erroneous which places the burden of proof on the State to show guilt beyond a reasonable doubt and on the defendant to satisfy them with his evidence of matters in mitigation or excuse.

APPEAL by defendant from *Finley, J.,* at February Term, 1930, of HAYWOOD. No error.

Hugh Allison, Wade McDaniel, and Rufus Allison were indicted for the murder of Fred Caldwell. When the case was called the solicitor took a *nol. pros.* with leave as to Wade McDaniel and Rufus Allison and prosecuted the action against Hugh Allison only. The jury returned a verdict of manslaughter, and from the sentence pronounced the defendant appealed upon assigned error.

On 19 October, 1929, the defendant and Wade McDaniel met each other in Waynesville and went in a car to Allison's home, some miles in the country. They returned to Waynesville and McDaniel asked the defendant to take him home. They started on their journey and arrived at C. C. Moody's store and filling station on the Dellwood road, where a community road leading to McDaniel's home leaves the concrete highway. There was evidence that they got some liquor there. Some unpleasant words passed between McDaniel and the deceased, followed by threats and acts of violence in which these two, the deceased, D. L. Caldwell, brother of the deceased, A. B. Caldwell, his father, and Rufus Allison, brother of the defendant, directly or indirectly took part. The defendant and McDaniel returned to and spent an hour in Waynesville, when McDaniel again asked the defendant to drive him home. On their way they went the second time to Moody's store and there the second time they stopped the car. Immediately a conversation arose tending to renew the difficulty. Parties representing each side of the combat used profane and obscene language. There is evidence that the defendant, Wade McDaniel, and the deceased each had a pistol. With respect to some of the subsequent events the testimony is conflicting. The deceased started home, followed by his father and by Charley Caldwell, his cousin. The defendant and Wade McDaniel got in the car, a Ford roadster, the defendant driving, McDaniel in the seat to his right, and Rufus Allison and Jack Jones on the left running board. The car went down the road just behind the deceased, the car and the deceased going in the same direction. Near

Moody's store is a railroad and beyond the railroad is a bridge. After the car had passed over the bridge and had gone about ten steps the deceased was shot and killed. The defendant's version of the homicide was this: "We drove on down to the railroad and Fred was just across the railroad and started across the bridge, and there was a hole on the left side of the bridge; it has been repaired since, and there wasn't room to pass there and I slowed up to give him time to get where the road was wide enough and then we come on; we were going very slow, five or six miles an hour; I didn't want to crowd him. Along where I was at the time the road is about 12 or 14 feet wide. When we got out to where he was and started by him I pulled to the left away from him, and just as we got around he turned around with a pistol in his hand and called us God damned sons of bitches and said to stop, and I stopped, and he come to the car and said he was going to blow both of our God damned hearts out, and I said, 'What do you want to do that for?' and he said, 'I don't give a God damn,' and he stepped back about two steps and said to Wade, 'Are you ready to die?' and then he was shot. His pistol was up like that, pointed toward Wade. Wade shot the pistol. He had his right hand on the door and Fred walked up to the car and cursed us and Wade got his pistol with his left hand from his belt and threw it up on his right arm and shot him with his left hand. I don't know how many times he shot him. All the time that Wade was shooting Fred had his pistol drawed right on him. Wade didn't shoot any after Fred started to fall; the pistol firing was so fast I couldn't tell how many times he shot. I hadn't said anything to Fred except that I didn't want to have any trouble with him. I didn't fire my pistol at Fred Caldwell; it was behind the seat; it is a .32. Up to that time I didn't know Wade had a pistol. I saw it after we went on around toward Lake Junaluska; it looked to be a .38."

Wade McDaniel testified: "There was one seat in the car; it was headed down that road; that is in the direction of my home; it is also the direction of Fred Caldwell's home. Jack Jones and Dock Allison got on the left side; they asked Hugh if he was going up in the Cove and Hugh said yes, and Dock said, 'I am going on home,' and Jack Jones said, 'If you are going I want to ride up there.' Ruf Allison lives with his father, below where I live. We drove on down and hit the bridge and Hugh had slowed up till Fred got across the bridge; there was two bad holes where you crossed the bridge and he had to pull to the right to miss the holes; you would be liable to break a spring, and Hugh slowed up and Fred walked on and after we drove out to dodge the holes Hugh pulled in to the right and then cut to the left and about that time the hind wheels were across the bridge and the right fender was about even with Fred and he wheeled with his gun, jerked it out and

said, 'Stop, you God damned sons of bitches, I will kill both of you,' and I said to stop; that he had a gun and would shoot both of us, and Hugh stopped and Fred give about two steps over to the car where we were and he had his gun in his hands, and he said, 'I am going to kill both you God damned sons of bitches,' and Hugh said, 'What are you going to do that for?' and Fred said, 'I don't give a God damn,' and stepped back like that and said, 'Wade, are you ready to die?' And I never give him any answer. I had my right hand lying upon the car door like that, and my gun was here in my belt, and Fred had his gun on us; he had a blue steel gun, and I didn't do a thing but grab my gun and lay it on my arm and I shot till Fred's gun went off of me. When I fired my gun the first time Fred Caldwell's pistol was sticking right in my eye like that. I don't remember how many times I shot; I was so excited I shot till that gun went off of me. When I emptied the gun after the shooting there were four shells shot. The gun would shoot six times. There were two loaded cartridges in the pistol after the shooting; that would make me shoot four times. I shot just as fast as I could. My pistol is a .38 Colts Spain; it was a Spain gun; I reckon it meant it was made in Spain. After I shot four times Fred fell over; his gun went out of my face, and he fell over."

The State's evidence tended to show that the defendant drove the car within three or four feet of the deceased; that the deceased stepped from the road against a wire fence; that when the car stopped Wade Mc-Daniel was nearest the deceased; that four or five shots were fired from the car. A witness said, "At the time of the shooting Fred (the deceased) wasn't doing anything; he just turned around and they shot him; and after the first two shots he flirted around and caught at the fence, and then three other shots fired. I didn't see any gun or rock in his hand and at the time of the shooting; his arms and hands were down that way." There was evidence that his pistol was in his right hip pocket when he fell.

On cross-examination the defendant said: "I am married; I do not own any land; I haven't any money on which my wife and I live. . . . For two or three years I haven't done anything but haul and sell liquor; I got an income from that. I have peddled it in town and all over the county. I don't know that there was an organized ring; there was just me in it. When I was hauling whiskey I always carried a pistol; I don't know why; I just carried it."

Wade McDaniel testified that on the morning after his arrest and imprisonment he told an officer that the defendant shot the deceased, and that he did so because the defendant had fled—because he could save himself by saying that the shots were fired by the defendant who had fled and would not return.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Morgan, Ward & Stamey, John M. Queen and Alley & Alley for defendant.*

ADAMS, J. The car that followed the deceased when he started home was occupied by the defendant and Wade McDaniel. It had only one seat. The defendant, who drove the car, sat at the left and McDaniel at the right. Rufus Allison and Jack Jones were on the left running board. The deceased was walking on the right-hand side of the road, and when the parties overtook him he was killed by pistol shots fired from the car.

Both the defendant and McDaniel testified that McDaniel had shot and killed the deceased with a pistol. For this reason the defendant has no just cause of complaint on the ground that the court did not submit to the jury, as a distinct phase of the evidence, the question whether the defendant himself had not fired the fatal shots. His testimony taken with that of other witnesses raised the vital question whether he had aided and abetted McDaniel in the commission of the crime; and upon this theory the case seems to have been tried.

A person concerned in the commission of a felony may be a principal in the first or in the second degree. A principal in the first degree is the person who actually perpetrates the deed, and a principal in the second degree is one who is actually or constructively present when the crime is committed and aids and abets another in its commission. "The law, however, recognizes no difference between the offense of the principal in the first degree and of the principal in the second; both are equally guilty. And so immaterial is the distinction considered in practice, that if a man be indicted as principal in the first degree, proof that he was present aiding and abetting another in committing the offense, although his was not the hand which actually did it, will support the indictment; and, on the other hand, if he be indicted as principal in the second degree, proof that he was not only present, but committed the offense with his own hand, will support the indictment." 1 Archbold's Criminal Prac. and Pleading (13) (14). In *S. v. Whitt,* 113 N. C., 716, the Court quoted from Wharton's Criminal Law (9 ed.), 221, to the effect that "the distinction between principals in the first and second degrees, is a distinction without a difference." In the same case it was held that a principal in the second degree may be convicted even where the principal in the first degree has been acquitted; and in *S. v. Jarrell,* 141 N. C., 722, it is said that one principal may be convicted when the other has not been tried. The law relating to accessories before the fact has no application. *S. v. Jones,* 101 N. C., 719. So

if McDaniel shot and killed the deceased under circumstances that would make him guilty of felonious homicide and the defendant was present encouraging, aiding and abetting the perpetration of the deed, the defendant and McDaniel would be guilty of the same degree of crime. *S. v. Whitson,* 111 N. C., 695. It is manifest that this is what his honor had in mind when he referred to McDaniel's act, if he killed the deceased, as a controlling factor in the trial of the defendant.

A person may aid and abet the commission of a homicide by giving help to the perpetrator; by encouragement in acts or words; by inciting, advising, or counseling the deed; by concert of action; and by other unlawful acts naturally resulting in death. *S. v. Powell,* 168 N. C., 134. Indeed, "Where the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone may be regarded as encouraging." 1 Wharton's Cr. Law, sec. 211a; *S. v. Jarrell, supra; S. v. Cloninger,* 149 N. C., 567.

Let us keep in mind the testimony of the defendant, and that of McDaniel, that McDaniel had killed the deceased with a deadly weapon. There is unquestionable evidence that the defendant was present aiding and abetting in the perpetration of the deed—evidence, in fact, that from their first meeting with the deceased they were acting in concert. Each of them was armed with a pistol; at the fatal moment they were together in the car; together they left the scene of the homicide; and in their flight, as a witness for the State testified, the defendant was heard to say in the presence of McDaniel, "We killed a man and must get away from here."

It was under these circumstances that the trial court imposed upon the State the burden of proving beyond a reasonable doubt "that the defendant was aiding and abetting and encouraging by his acts and by his presence and conduct the killing of the deceased on the part of Wade McDaniel," and, in that event, likewise imposed upon the defendant the burden of showing to the satisfaction of the jury such facts and circumstances as would mitigate or excuse the offense committed by the defendant and McDaniel as coprincipals. It will be seen that the instructions which are the subject of the defendant's third, fourth, fifth, sixth and eighth assignments of error, were intended to apply to the latter proposition, and in this view they embody a correct statement of the law.

The defendant was not convicted of murder, but of manslaughter. Under the charge to the jury the verdict is equivalent to a finding that McDaniel's act was manslaughter and that the defendant was guilty in the same degree. We are of opinion that the first and second assignments present no sufficient cause for a new trial. Whether a serious

question would have been raised if the defendant had been convicted of murder in the first degree is a matter with which we are not concerned.

It may be noted that the instructions referred to in the first and second assignments are predicated upon the finding that the defendant and McDaniel were coprincipals, and not that they acted independently, as was contended in *S. v. Orr,* 175 N. C., 773, and *S. v. Greer,* 162 N. C., 640.

No error.