72 P.(2d) 609

**STATE v. OCHOA et al.**

No. 4220.

Supreme Court of New Mexico.
Aug. 25, 1937.

Rehearing Denied Oct. 15, 1937.

John F. Simms, of Albuquerque, Wheaton Augur, of Santa Fé, Francis A. Brick, Jr., and Walter N. Thayer, 3d, both of New York City, and Hugh B. Woodward, of Albuquerque, for appellants.

Frank H. Patton, Atty. Gen., and J. R. Modrall, Asst. Atty. Gen., for the State.

SADLER, Justice.

The defendants were convicted of murder in the second degree in a trial before the district court of San Juan county on change of venue from McKinley county. They prosecute this appeal from the judgment of conviction pronounced upon them at such trial. The victim of the homicide was M. R. Carmichael, sheriff of McKinley county. He was slain while accompanying a prisoner from the office of the local justice of the peace to the county jail.

The homicide occurred about 9:30 o'clock in the forenoon of April 4, 1935. A few days previously one Esiquel Navarro, one Victor Campos, and a Mrs. Lovato had been arrested on warrants charging the unlawful breaking and entering of a certain house. Theretofore the house had been occupied by said Campos who was evicted in forcible entry and detainer proceedings. Following eviction, so the charge ran, the three persons just mentioned forcibly re-entered the house and replaced Campos' furniture therein. The preliminary hearing for Navarro, who was confined in jail, was set for 9 a. m., April 4th.

The house in question was located in a section of Gallup known locally as Chi-

huahuita, largely occupied by former employees of a coal mining company. Considerable excitement had been engendered among them by the eviction proceedings and the approaching trial of Navarro. At a mass meeting held in Spanish-American Hall in Gallup on the afternoon of April 3d, attended by some fifty or sixty people but not shown to have been called especially for the purpose, a committee was appointed to confer with Sheriff Carmichael regarding Navarro. The committee waited upon the sheriff and demanded Navarro's release. This request was denied. Some members of the committee then asked permission to talk with Navarro. This request likewise was denied by the sheriff, who informed the committee Navarro's trial would take place at 9 a. m. the following day and that they then could see him.

The sheriff, accompanied by several deputies, left the jail with the prisoner, Navarro, shortly before 9 o'clock the morning of April 4th and proceeded to the office of Justice of the Peace William H. Bickel on Coal avenue, a distance of one and one-half blocks. Arriving there, they found the justice engaged in the hearing of another matter and were compelled to await the conclusion of that hearing. Soon after they arrived a crowd of approximately 125 people, included in which were many women and children, gathered on the sidewalk and in the street in front of the office of the justice of the peace. The crowd was made up largely of friends of the prisoner, Navarro. The officers, even before leaving the jail with the prisoner, had become apprehensive that an effort might be made to rescue him. So that, when the crowd sought admittance to the justice's chambers which had seating capacity for not more than 25 spectators, none except witnesses were permitted to enter.

The crowd in front grew threatening. They pressed against the plate glass windows to the extent that one of them was cracked; pounded on the windows with their fists; shouted, cursed; and some threatened to kick the door down if they were not admitted. After some delay incident to completion of the other hearing, and upon Navarro's objection that he had no attorney, the hearing of his case was postponed for the purpose of enabling him to secure an attorney to represent him.

Apprehensive of trouble in attempting to make their exit from the office of the justice through the crowd at the front entrance en route back to the jail, the sheriff directed that Navarro should be removed through the rear door. In an endeavor to screen as much as possible this maneuver from the crowd in front, the sheriff directed two of his deputies to stand against the front windows.

As Sheriff Carmichael reached for the prisoner's arm to begin the exit from the building, Navarro communicated with the crowd outside by a motion with his arms suggestive that he was being removed through the rear door. This door opened

into a 16-foot paved alley extending from Third street to Second street. Third street intersects Coal avenue, upon which the justice's office is located, only a few doors west of the front entrance to said office. The jail is located on Second street at its intersection with the alley, and it was the plan of the officers to escort the prisoner through the alley to the jail, thus avoiding the crowd.

Upon discovering the maneuver of the officers, however, the crowd ran to the corner of Third street and Coal avenue, down Third to the alley, and converged eastwardly upon the rear entrance to the justice's office, forming in a semicircle around the entrance. The officers, nevertheless, succeeded in getting their prisoner into the alley, pushing their way through the crowd, and proceeded eastwardly toward the jail with the prisoner. Sheriff Carmichael was on the prisoner's right, holding him by the right arm, and Undersheriff Dee Roberts was on the prisoner's left, holding him by the left arm, walking eastwardly toward the jail. As they proceeded up the alley toward the jail they were surrounded by the crowd, some of whom were ahead of them, some on either side and some to their rear. The officers with the prisoner were followed by Deputies E. L. "Bobcat" Wilson and Hoy Boggess in the order named.

The prisoner was obstinate, holding back and forcing the officers to push or urge him on. An unidentified person in the crowd had been heard to shout: "We want Navarro." When they were about forty feet from the rear exit of the justice's office, Deputy Hoy Boggess observed someone, unknown to him, grab at the prisoner as if to take him from the custody of the officers. Thereupon, he raised his arm and hurled a tear gas bomb to the rear and westwardly into the crowd in the alley. Almost simultaneously with the detonation from explosion of the bomb, a shot was fired somewhat to the rear of the officers accompanying the prisoner. Then a second shot followed the first, apparently fired by Ignacio Velarde, a brother of the defendant Leandro Velarde, from a point at the northeast corner of the Independent Building, some fifteen feet from Sheriff Carmichael. This shot struck the sheriff in the left side of the face and passed out of his body on the right side of his neck. The first shot fired had struck the sheriff in the left side, just under the left arm, passed through his chest and out into his right shoulder. He died instantly, his undersheriff, Dee Roberts, catching hold of his right arm and lowering his body to the pavement. The latter then looking to the west observed two men firing toward him. One was on his left at the corner of the Independent Building, perhaps fifteen feet distant. This proved to be Ignacio Velarde. The other was farther down the alley about twenty feet and to his right. This was Solomon Esquibel. Their fire was returned by Undersheriff Roberts, and both Ignacio Velarde and Solomon Esquibel were killed.

In the meantime the firing had become more general, the total number of shots fired during the affray being twelve to fifteen. When the firing ceased, besides Sheriff Carmichael and the two others named being killed, Deputy Wilson had been seriously wounded by a bullet which entered his body about an inch below the armpit and was later extracted. Two other members of the crowd had received wounds, a woman by a shot through the leg. Both of these wounded, as well as Deputy Wilson, subsequently recovered.

With this general statement of events leading up to the homicide, we shall now particularize in our statement of the facts, detailing the evidence upon which the state relies to show guilty connection of defendants with the resulting homicide. This will require some recapitulation.

About the time it was appreciated by the crowd in front that the prisoner was to be removed through the rear door into the alley, the defendant Leandro Velarde was seen going through the crowd motioning toward the west, the direction to be taken to reach the alley, and he went into the alley practically at the head of the crowd.

The three defendants, Leandro Velarde, Manuel Avitia, and Juan Ochoa, along with certain other defendants acquitted at the trial, were identified as being in the crowd in front of the justice's office and also in the crowd at the rear of the office in the alley after it had hastened there upon discovering that the prisoner, Navarro, was to be removed through the rear door and thence via the alley to the jail. The present defendants, along with Ignacio Velarde and Solomon Esquibel, slain during the affray, were in the forefront of the crowd formed in a semicircle around the rear entrance as the officers prepared to emerge with their prisoner.

Just before they took the prisoner through the rear entrance, former Deputy Fred Montoya, who formed one of the sheriff's party at the justice's office, at the sheriff's request, opened the rear door. He took one step outside. There confronting him among those recognized were Ignacio Velarde, Leandro Velarde, and Solomon Esquibel. Leandro Velarde, clenching his fist and raising it in a threatening manner, said to Montoya: "Now you shall see what happens disgraced (one)." Solomon Esquibel, reaching his right hand into a partially open blue jacket worn at the time as if to draw a weapon, said: "You move back, leave them to us alone." Montoya being unarmed immediately moved back inside the office of the justice of the peace.

Contemporaneously with Montoya's return to the inside of the office, Sheriff Carmichael and Undersheriff Dee Roberts emerged therefrom with the prisoner. As they did so and started pushing their way out into the alley, the defendant Juan Ochoa, from a distance of about three feet, struck at Undersheriff Dee Roberts with a claw hammer.

When the officers had advanced a short distance up the alley with their prisoner,

the defendant Manuel Avitia drew a pistol from his pocket and rushed from the rear through the crowd toward the officers. After hurling the tear gas bomb, and just before being struck and rendered unconscious, Deputy Boggess observed the defendant Leandro Velarde only a few feet from him on the right; Solomon Esquibel, later slain, not far away; and the defendant Manuel Avitia running toward him (Boggess). When Boggess fell unconscious from a blow on the head delivered by some unidentified person in the crowd, his pistol fell from his belt to the pavement. Two members of the crowd were seen to spring toward same and to be bent over as if to recover it, but, their bodies screening it from view of the witness relating the incident, neither of these persons was seen actually to pick up the pistol.

While Deputy Boggess was down on the paving and after the firing had begun, the defendants Avitia and Ochoa, with two or three other persons, were seen beating and kicking him. When the shooting had ceased Avitia ran west out of the alley with a pistol in his hand.

Juan Ochoa was chairman of the meeting held at Spanish-American Hall the afternoon before the affray at which meeting a committee was named to interview the sheriff regarding Navarro. Leandro Velarde attended the meeting and was named a member of said committee, though it is not established that he actually went with the committee to see the sheriff.

Manuel Avitia also was present at the meeting.

On March 29th, preceding the affray, at a gathering at the home of one Mrs. Conception Aurelio about 4 o'clock in the afternoon, Leandro Velarde told the group, there gathered, "to prepare for the following day at 8 o'clock in the morning; that they were to be ready at the house of Victor Campos and to be prepared—to be ready and let the officers take their weapons; that they didn't need anything else but a tooth pick." Also he said at this time that the first one they wanted to get hold of was Carmichael, "because he had a feeling against Carmichael and Carmichael had a feeling against him." He further said, "that he didn't care to die for the poor; that he had a big body and he was going to stick it out for the poor." The meeting planned evidently had to do with restoring Campos to the house from which he had been evicted.

About thirty minutes after Sheriff Carmichael was killed, Leandro Velarde returned home and withdrew from the bib of his overalls an ice pick some six inches in length and placed it in an ice chest.

When Deputy Hoy Boggess regained his feet upon a return of consciousness, he saw Deputy Wilson approaching him in a stooped posture and heard him say: "I'm shot." Finding his own pistol missing, he seized that of Wilson and still in a dazed condition fired twice at two persons he saw fleeing, one of whom he thought was

the prisoner Navarro making his escape. He could not say whether either of his shots took effect.

The pistols with which Ignacio Velarde and Solomon Esquibel were seen firing were never located after the affray. The pistol which dropped from Deputy Boggess' belt when he was knocked unconscious was never recovered. Sheriff Carmichael's pistol was removed from its scabbard on his body after his death. It had never been fired. The bullet which had entered the body of Sheriff Carmichael under the left armpit was later extracted from his right shoulder. The bullet which had wounded Deputy Wilson likewise was later extracted. The pistol which Deputy Boggess lost during the affray and which had not been fired by him when lost was a forty-five Smith and Wesson double action. The bullet removed from the body of Sheriff Carmichael and that extracted from Deputy Wilson were both fired from the same pistol and it was of the same make and caliber as that lost by Deputy Boggess, using the same type of ammunition as that then employed in the Boggess gun.

The defendants were proceeded against by information, the State electing to employ the short form authorized by Trial Court Rule 35—4407. Ten were thus accused of the murder of Sheriff Carmichael, of whom seven were acquitted by the jury. The three defendants above named having been convicted of second degree murder, they alone prosecute this appeal. The most serious claim of error is directed at the action of the trial court in submitting to the jury the issue of second degree murder. It is claimed the evidence does not warrant submission of second degree. If this claim be good as to all of the defendants it is decisive. Hence, we give it first consideration. The facts as we have recited them are within the verdicts of guilty returned against defendants. Do they support second degree? That is the issue.

Justifying the submission of both first and second degree, the Attorney General in the State's brief says: "Discarding all of the theories requiring a first degree or nothing verdict, we still have two theories presented by the evidence shown (under) which the jury might find the appellants guilty of second degree murder. First, that one of the appellants actually shot and killed Sheriff Carmichael. Second, that the appellants or any of them aided and abetted the person or persons who actually shot and killed Sheriff Carmichael. Under either of the circumstances it was mandatory on the trial judge to submit both first and second degree murder to the jury."

If there be evidence in the record sustaining a conviction of given defendants of second degree on either of the theories thus presented by the State, it will be unnecessary as to such defendants to pass upon sufficiency of the evidence to sustain the other theory. It is the jury's province to say whether the facts sustain either theory. Givens v. State, 8 Ala.App. 122, 62 So. 1020. In support of

the verdict, we must assume the jury to have adopted a theory sustained by the evidence. In this connection it should be stated. that as to the defendant Leandro Velarde there is no effort in the argument before us to connect him with the slaying otherwise than as an aider and abettor. As to the other two defendants, Avitia and Ochoa, it is different. The State urges there is evidence to sustain a finding that either of them actually fired one of the shots entering the body of Sheriff Carmichael, though argued as much more likely under the proof that Ochoa did so, using the gun which fell from the waistband of deputy Boggess when he was assaulted and knocked unconscious. Of course, the theory of aider and abettor also is urged against Avitia and Ochoa.

■ First, we must appraise the situation resulting from the jury's verdict. The defendants assert without contradiction by the State that the trial court eliminated conspiracy by refusing to submit the issue. We shall so consider the record although it is perhaps unimportant for even if conspiracy remained in the issues as submitted it was completely put out of the case by the jury's verdict acquitting the defendants of the charge of first degree murder. First degree, and that alone, would conform to a verdict carrying a finding of conspiracy. The same may be said of the charge of murder perpetrated in the commission or attempt to commit a felony.

A careful reading of the instructions, particularly paragraphs 19 and 20 thereof, might be urged as leaving it still within the jury's province to find conspiracy based upon evidence of events transpiring between commencement of Navarro's trial before the justice of the peace and the occurrence of the homicide. But counsel have seemingly agreed, and perhaps properly, that conspiracy was not submitted. Certainly, if submitted, even within a narrow compass, as already said, the verdicts of the jury completely erased it as an issue.

The return of verdicts of second degree against defendants had the important effect of acquitting them of the charge of first degree upon the theory of a homicide committed in the perpetration of a felony, to wit, the aiding of the prisoner, Navarro, to escape. So, as the matter rests before us, the State must defend the verdict as one finding the defendants guilty of common-law murder, either as principals or as aiders and abettors. This greatly narrows the issue under defendants' contention that second degree was not properly submitted. It also differentiates this case from that of State v. Reed, 39 N.M. 44, 39 P.(2d) 1005, 102 A.L.R. 995. And there are other differences not necessary to enumerate.

We do not understand counsel to contend that the unexplained killing of Sheriff Carmichael with a deadly weapon would not warrant submission of second degree. But, rather, that there is not sufficient evi-

dence to connect them with the slaying, either as the actual slayers or as aiders and abettors. The point now argued is in effect complaint at the trial court's failure to direct a verdict of acquittal as requested.

The trial court fairly defined aiding and abetting for the jury. At least, there is before us no objection to the charge in this respect. The law upon the subject of aiding and abetting in the commission of a homicide has been declared in decisions of this court both prior and subsequent to statehood. Territory v. Lucero, 8 N.M. 543, 46 P. 18; United States v. Densmore, 12 N.M. 99, 75 P. 31; State v. Trujillo, 30 N.M. 102, 227 P. 759; State v. Wilson, 39 N.M. 284, 46 P.(2d) 57.

■ The distinction between an accessory before the fact and a principal and between principals in the first and second degree, in cases of felony, has been abolished in New Mexico and every person concerned in the commission thereof, whether he directly commits the offense or procures, counsels, aids, or abets in its commission, must be prosecuted, tried, and punished as a principal. Laws 1933, c. 105; Trial Court Rule 35—4439. The evidence of aiding and abetting may be as broad and varied as are the means of communicating thought from one individual to another; by acts, conduct, words, signs, or by any means sufficient to incite, encourage or instigate commission of the offense or calculated to make known that commission of an offense already undertaken has the aider's support or approval.

State v. Wilson, supra. Mere presence, of course, and even mental approbation, if unaccompanied by outward manifestation or expression of such approval, is insufficient. Territory v. Lucero, supra; State v. Hernandez, 36 N.M. 35, 7 P.(2d) 930.

■ Before an accused may become liable as an aider and abettor, he must share the criminal intent of the principal. There must be community of purpose, partnership in the unlawful undertaking.

"To aid and abet another in a crime one must share the intent or purpose of the principal. If two or more acting independently assault another, and one of them inflicts a mortal wound, the other is not guilty as an aider and abettor. An aider and abettor is a partner in the crime, the chief ingredient of which is always intent. There can be no partnership in the act where there is no community of purpose or intent." Landrum v. Commonwealth, 123 Ky. 472, 96 S.W. 587, 588, as quoted in Gill v. Commonwealth, 235 Ky. 351, 31 S.W.(2d) 608.

"To render one an aider or abettor and, as a consequence, guilty in like degree with the principal in the commission of a crime, there should be evidence of his knowledge of the intention or purpose of the principal to commit the assault. In other words, there must have been a 'common purpose' by which is meant a like criminal intent in the minds of Mills and the appellant, to render the latter guilty as charged, and hence authorize the giving

of the instruction." State v. Porter, 276 Mo. 387, 207 S.W. 774, 776.

The accused may not be held for the independent act of another even though the same person be the victim of an assault by both. In such circumstances there is wanting that sharing of criminal intent essential to proof of aiding and abetting. Gill v. Commonwealth, supra; State v. Greer, 162 N.C. 640, 78 S.E. 310.

In what has been said concerning the law of aiding and abetting our comment is to be confined to pure instances of such. Of course, where conspiracy is established, all are equally guilty whether present or not and irrespective of physical participation, aid or encouragement extended at the time of the offense. The distinction between conspiracy and aiding and abetting is clearly developed in State v. Porter, 276 Mo. 387, 207 S.W. 774. A case where, as here, the State's attempt to establish conspiracy failed, yet the evidence was held sufficient to sustain conviction of accused as an aider and abettor, is Maloy v. State, 8 Ala.App. 73, 62 So. 961.

In many, if not most, conspiracy cases, where conviction results, the accused under the proof could as well have been convicted as an aider and abettor, without the conspiracy charge. This because nearly always he is found present actively participating in the homicide. Aiding and abetting usually accompany conspiracy, though there are frequent cases of aiding and abetting without conspiracy. Never-

theless, in the latter cases there is present something akin to conspiracy. It is the community of purpose and concert of action disclosed. These elements must emerge coincident with the affray or during its progress. If prior thereto, they strongly suggest conspiracy.

With these preliminary observations, we shall proceed to apply them to the facts of the instant case. As to the defendant Leandro Velarde there is no evidence which sufficiently connects him with the unlawful design of the slayer of Sheriff Carmichael. The last time seen prior to the hurling of the tear gas bomb and the firing of the first shot, he was in the crowd a few feet removed from Deputy Boggess. There apparently was nothing about his actions when then seen to excite suspicion. If so, it was not testified to by any witness.

Much of what he is shown to have said and done at and about the scene of the justice court trial and upon exit of the officers and their prisoner into the alley would be somewhat significant in proof of the charge of conspiracy. But of that charge he was acquitted. It would even serve to color and characterize any overt act or conduct on his part *after he became aware* that some member of his party was firing or was about to fire on the sheriff and his party. But no such act or conduct appears in the evidence. He is not shown to have taken part in the assault on Deputy Boggess, as were Avitia and Ochoa. At one stage of the proceedings,

as this defendant rested his case, the following colloquy between court and counsel occurred, to wit:

"The Court: Come up here gentlemen. (done) Prior to the opening of Court this morning I advised counsel for the defendants, I understood application would be made to replace the witness Boggess on the stand to testify as to receiving wounds with an ice pick, but no record was made of the statement. If the witness appears, I will then hear the application of the State to reopen.

"Mr. Simms: And the Court will then give us an opportunity to resist the application?

"The Court: Yes, and any further testimony you desire for Velarde."

The suggested testimony was never forthcoming. If Velarde had on his person at the affray the ice pick which he removed from the bib of his overalls and placed in an ice chest in his home half an hour later, no proof of any display of same and of an effort to use it was presented at the trial. We do not find in the record evidence supporting the conviction of this defendant as an aider and abettor. Mere suspicion does not furnish the required support. Watkins v. Commonwealth, 227 Ky. 100, 12 S.W.(2d) 329.

The defendants Avitia and Ochoa are differently situated. After Deputy Boggess hurled the tear gas bomb, he was knocked down and rendered unconscious for a time. Firing from the party of which they formed a part started almost instantly and continued until a total of as many as 12 or 15 shots had been exchanged between members of the two parties. Even if it be assumed that these two defendants were without previous knowledge of the purpose of the slayer or slayers of deceased to make an attempt on his life, the evidence abundantly supports an inference that with the firing of the first shot they became apprised of that purpose. The intent to kill, or to aid and abet in the commission thereof, may be formed at the scene of the crime, even though the accused may have gone there without such intention. People v. Will, 79 Cal.App. 101, 248 P. 1078. If, with knowledge that one of their party was using or was about to use a deadly weapon, they or either of them rendered aid or assistance to him or them engaged in the deadly assault, they are equally guilty as aiders and abettors. The aider under such circumstances adopts the criminal intent of the principal. State v. Powell, 168 N.C. 134, 83 S.E. 310. Both Avitia and Ochoa are identified in the testimony as being still engaged in an assault upon the fallen Boggess after two bullets had entered the body of the deceased. Boggess was a deputy of the slain sheriff and, of course, would be expected to come to the aid of his chief in peril. The fact that they were thus engaged in a vicious assault upon him (Boggess), after firing upon the sheriff's party commenced, left it within the jury's province to infer, if it saw fit, not alone that these defendants

shared the intent of the slayer, but also that they aided and abetted him in his unlawful undertaking.

Nor would it seem an unwarranted inference, if the jury should elect so to find, that these defendants saw the sheriff's assailant in the act of drawing or aiming his gun and commenced the assault on Deputy Boggess momentarily before or simultaneously with the first outburst of gunfire. Particularly is this true in view of the fact that the assault on Boggess did not cease when it must have become known to the defendants that a member of their party was firing on the sheriff's party. Such an inference, however, is not essential to sustain the verdicts.

The opinion of the Supreme Court of Ohio in Woolweaver v. State, 50 Ohio St. 277, 34 N.E. 352, 353, 40 Am.St.Rep. 667, points out the difficulty frequently presented where a homicide results from a clash between opposing parties and at the moment of the homicide a member of one party is engaged in a struggle with a member of the opposing party other than the deceased. For error in instructing that if what defendant did "tended" to incite the slayer (a substitution by the trial court for the language of the requested instruction that if done "with a view" of inciting him), the Supreme Court awarded a new trial. The opinion makes plain, however, that even though there be opposing parties of several members each, the controlling principles remain the same. The court said: "In the case under consideration there was evidence tending to show that the plaintiff in error and his two sons composed one party, while the deceased and Mr. Ewing, and probably Mr. Lyons, composed the other party. This difference in the circumstances in no wise affected the principles by which the criminal character of the acts of the parties should be tested. If there was a conspiracy, each conspirator was chargeable with the acts of his co-conspirators. If there was no conspiracy, then, upon the springing up of a sudden fight, each should be chargeable only with his own acts, and such acts of the others, as he may purposely incite or encourage. The charge, in the form in which it was requested, correctly stated this proposition. Where satisfactory proof of a conspiracy has not been produced, it often becomes a nice and difficult matter to determine the criminal liability of each of a party of friends or kindred for the violent and unlawful acts of his fellows, committed in the course of a conflict, arising upon a sudden quarrel, with one or more antagonists; and in such case, upon the trial of one of them, it is of the first importance that the correct rule of liability should be laid down to the jury, and if the instructions should extend too far as to the liability of the one on trial for the acts of his fellows it would be, necessarily, prejudicial to his rights."

The opinion of the Court of Criminal Appeals of Texas in Bibby v. State (Tex. Cr.App.) 65 S.W. 193, 195, states clearly the rule of responsibility applicable where several members of opposing parties are

fighting apart, engaged in separate combats, when one, without previous knowledge by other members of his party of his intention to do so, suddenly begins the use of a deadly weapon on his antagonist. The court said: "If the evidence here showed that the parties had entered into a conspiracy to disturb the meeting, and thus provoke a difficulty, and to resist all opposers, even to the use of deadly weapons, then the charge of the court linking appellant and his intent irrevocably with the act of Wells in his intent would be good law as presenting that phase of the case. But we do not understand such to be the case here. * * * Here the only proof against appellant is that he, with the others, did disturb the meeting, and that he afterwards engaged in the difficulty. There is no proof that he used any weapon, nor is there any proof to show that he knew Wells or Starnes were using their pocket-knives. If Wells or Starnes used a knife in the difficulty without the knowledge or consent of appellant, he is not responsible for the homicide. *Or, to put it more strongly, the proof must show beyond a reasonable doubt that he knew Wells was to use the knife beforehand, or that he had knowledge Wells was using the knife at the time he was so using it, and by some act of his aided and abetted him in the use of said knife.*" (Italics ours.)

See, also, Cecil v. State, 44 Tex.Cr. 450, 72 S.W. 197 and Lyons v. State, 30 Tex. App. 642, 18 S.W. 416, for other Texas cases affirming the same proposition.

The mere statement of the proposition, however, furnishes its own support; for, however free from felonious intent a participant in the combat of opposing parties may have been in the beginning, once it becomes known to him that another member of his party is employing a deadly weapon, he exposes himself to an inference of sharing the latter's intent if, except in necessary defense of his own person, he continues his participation. The question of whether the alleged aider and abettor did share the principal's criminal intent, and whether he knew the latter acted with criminal intent, is one of fact for the jury and may be inferred from circumstances. Wharton on Homicide (3d Ed.) § 50.

The following authorities, some of which bear resemblance to the case at bar in their facts, sustain the conclusion that there was sufficient evidence to sustain a conviction of Avitia and Ochoa as aiders and abettors if the jury saw fit to accept it, to wit: State v. Trujillo, 30 N.M. 102, 227 P. 759; State v. Hoffman, 199 N.C. 328, 154 S.E. 314; Davis v. State (Okl.Cr.App.) 57 P. (2d) 634; People v. Cione, 293 Ill. 321, 127 N.E. 646, 12 A.L.R. 267; Maloy v. State, 8 Ala.App. 73, 62 So. 961; State v. Powell, 168 N.C. 134, 83 S.E. 310; Commonwealth v. Murrano, 276 Pa. 239, 120 A. 106; State v. Kukis, 65 Utah, 362, 237 P. 476; People v. Will, 79 Cal.App. 101, 248 P. 1078.

Error is assigned upon the trial court's refusal to grant the defendants' motions

for an election and severance. The right to election was based upon the number of theories advanced in response to demands for bills of particulars in view of the fact that there were ten defendants jointly informed against. The defendants moved severally to require election at the beginning of the trial, again when the State rested its case in chief and finally at the close of the evidence. In each instance the motions were denied. The motions for severance came at the conclusion of the trial in connection with settlement of the instructions when, as defendants' counsel then conceived and now contend, the trial court eliminated the State's theory of conspiracy from its instructions. The severance motions were coupled with a prayer for an order to declare a mistrial and to grant each defendant a separate trial. The facts must be supplemented briefly to afford an intelligent understanding of this claim of error.

As already stated, the short form of information was employed in which all defendants were named and charged only with murder. A demand for a bill of particulars followed and one was filed. It presented a theory of the guilt of all defendants for the murder of M. R. Carmichael accomplished by means of a certain bullet fired from a deadly weapon, to wit a pistol, inflicting mortal wounds, etc. Approximately four months later the defendants moved for a further bill of particulars. A supplementary bill was filed in response to this motion accusing each of the defendants informed against of murder in the first degree under six different theories, in addition to the theory already set forth in the original bill, to wit:

"(a) That the defendants aided and abetted in an assault upon M. R. Carmichael, Dee Roberts, Hoy Boggess and L. E. Wilson, resulting in the killing and murdering of M. R. Carmichael.

"(b) That the defendants aided and abetted in unlawfully killing and murdering M. R. Carmichael.

"(c) That the defendants were engaged in the perpetration of a felony, to-wit: aiding and assisting Esiquiel Navarro, a prisoner, in escaping or attempting to escape from M. R. Carmichael and others, which resulted in the killing of M. R. Carmichael.

"(d) That the defendants and each of them combined and conspired to commit a felony, to-wit: aiding the prisoner Navarro to escape, the consummation of which conspiracy resulted in the killing of M. R. Carmichael.

"(e) That the defendants combined and conspired for the purpose of committing a felony, to-wit: an assault with deadly weapons, which assault resulted in the killing of M. R. Carmichael.

"(f) That the defendants combined and conspired for the purpose of committing a felony, to-wit: the killing and murdering of M. R. Carmichael."

Thus, as the matter was presented initially and as it actually went to trial, un-

der the original bill of particulars, each defendant faced a theory of firing the shot which killed the deceased. Under the supplementary bill, aiding and abetting in an assault upon Sheriff Carmichael and three of his deputies resulting in the former's death and aiding and abetting in unlawfully killing and murdering him, respectively, form the basis of the first two theories advanced; his murder perpetrated in the commission of a felony, to wit, aiding a prisoner to escape, constitutes the third theory; whereas, murder through conspiracy to do the murder itself, or to commit a felony resulting in death, constitute the basis of the fourth, fifth, and sixth theories presented.

The gist of defendants' objections to the trial court's action in this matter is contained in the following quotation from their brief, to wit: "With ten defendants to be tried jointly and with six theories against each, it is clear that the jury must have had to consider sixty separate statements of fact in order to give the defendants a fair and lawful trial. Insofar as the three specifications of conspiracy are concerned, the defendants could not at the opening of the trial say that they were entitled to a severance as to such accusations of conspiracy, because they stood informed against as conspirators under three of the State's theories, while as to the other three theories one defendant might have participated under one or more theories by his unaided action, while others of the defendants had no part therein."

The effect of Laws 1933, c. 105, and Trial Court Rule 35—4439, is that all persons concerned in the commission of a felony, whether by directly committing the act constituting the offense or by aiding and abetting in its commission, must be tried, prosecuted, and punished as principals and no additional fact need be alleged against an accessory than is required against the principal. Furthermore, the practice of pleading alternatively or disjunctively to meet varying possibilities in the proof long has been recognized in this state. Trial Court Rule 35—4434. It is to be remembered, too, that but a single offense, to wit, murder, was charged against defendants. The seven theories advanced in the bill of particulars were for the purpose of informing defendants of the different forms which the proof might take in establishing murder, a thing about which the state itself was uncertain at the time. The defendants asked for that information, and the State, which admittedly could not be confined to a single theory of guilt, furnished it. It was unknown to the State then, nor was it established with any degree of certainty thereafter, just who fired one of the shots which contributed to the death of Sheriff Carmichael. In view of this situation as presented at the opening of the trial, and to a lesser degree only at the close of the State's case in chief, it must have impressed the trial court as imposing a heavy burden on the State to compel it to elect at such times upon just which of the several theories it would stand.

■ We are not impressed that the trial court's action in this regard so perplexed and confused counsel or harmed defendants as to constitute its action error. At least, beyond the mere assertion that it did, counsel have not pointed out wherein it so operated. State v. Wilson, 25 N.M. 439, 184 P. 531; People v. Baldwin, 278 Ill. App. 327; King v. Commonwealth, 165 Va. 850, 183 S.E. 173; Ratliff v. Commonwealth, 182 Ky. 246, 206 S.W. 497, 499; Franklin v. State, 153 Ark. 536, 240 S.W. 708; State v. Coomer, 105 Vt. 175, 163 A. 585, 94 A.L.R. 1038; Raine v. State, 143 Tenn. 168, 226 S.W. 189; People v. Petruzo, 13 Cal.App. 569, 110 P. 324. Furst v. State, 31 Neb. 403, 47 N.W. 1116.

Meeting a similar contention in Ratliff v. Commonwealth, supra, where only one offense, murder, was charged, the Supreme Court of Kentucky said: "The motion to require the commonwealth's attorney to elect upon which count of the indictment he would rely for conviction was necessarily overruled. Such a motion could not have any merit, unless the indictment charged guilt of more than one offense. To require the prosecutor, where the modes of committing the crime alleged are set out in different counts, to rely for conviction upon the manner set out in one particular count, would defeat the very purpose for which it is permitted to set out the different modes in which the crime may have been committed in different counts."

"The court, at the conclusion of the evidence, denied a motion by defendant to compel the People to elect upon which count they would rely for a conviction. This is claimed as error.

"As previously stated, it is obvious that all of the counts related to the same transaction, but which was differently charged to meet variations of proof. Where this is true, no election will be required. People v. Dougherty, 266 Ill. 420 [107 N.E. 695]; Goodhue v. People, 94 Ill. 37. We think the motion was properly denied." People v. Baldwin, 278 Ill.App. 327.

"It is obvious that but one offense is charged in the indictment,—the murder of Pulsifer. Election is only required where separate and distinct offenses, not part of the same transaction, are charged in the same information or indictment. Bailey v. State, 4 Ohio St. [440], 442." Furst v. State, 31 Neb. 403, 47 N.W. 1116.

■ The trial court's ruling on the motions for severance was a matter peculiarly within its discretion and no abuse is evident in the denial thereof. Only for abuse of such discretion may this court interfere. State v. McDaniels, 27 N.M. 59, 196 P. 177; State v. Smith, 30 N.M. 364, 234 P. 467; State v. Watts, 35 N.M. 94, 290 P. 738. Because of the presence of conspiracy in the charge, defendants' counsel did not move for severance until that theory disappeared from the case.

The basis of the claimed right to severance was that testimony admitted against one defendant might prejudice the jury against another. We think the remarks

of the Court of Appeals of New York in People v. Fisher, 249 N.Y. 419, 164 N.E. 336, 338, including its quotation from People v. Snyder, 246 N.Y. 491, 159 N.E. 408, are pertinent to the contention here made. The court said: "The question always presented by such a motion [for severance] is whether a jury can properly weigh the testimony upon the various issues which may arise. 'The decision of the trial court rendered before the trial is dictated by reasonable anticipation based on the facts then disclosed. The decision of this court rendered upon a review of the trial itself rests upon determination of whether the prophecy has been realized.' People v. Snyder, 246 N.Y. 491, 497, 159 N.E. 408, 410."

Applying this test we have no hesitancy in saying that the joint trial of the defendants did not operate to their prejudice. Indeed, the jury seems to have exercised unusual discrimination in weighing the testimony as evidenced by their verdicts of acquittal returned in favor of seven of the defendants.

The defendants also complain of the action of the trial court in overruling motions to quash the information. While in the briefs their counsel invoke the same argument in support of this claim of error as that presented in challenging the trial court's rulings on their motions to elect and for severance, such does not appear to have been the objection urged against the information at the trial. There the claim was that the information as supplemented by the bill of particulars "failed to apprise the defendants, and each of them, of the exact nature of the offense with which they stand charged, * * * and in that the purported bill of particulars, as filed by the State, fails to sufficiently inform the defendants, and each of them, so that they may prepare an adequate defense at this time."

The grounds of the motions to elect being that the State had presented so many theories that it should be compelled to elect and to stand upon one alone, motions to quash upon the ground that the information and bill of particulars lacked sufficient particularity would seem to be somewhat inconsistent. We hold the information good as against the attack made upon it. We think it sufficient as supplemented by the bill of particulars fully to inform defendants of the exact nature of the offense with which they stood charged and as well of the means by which the State expected to prove its commission. Nor are defendants aided if we decide this point upon the argument submitted. The information charging but a single offense is permitted to charge its commission in different forms. Trial Court Rule 35—4434; Hill v. State, 42 Neb. 503, 60 N.W. 916; Shivley v. Commonwealth, 227 Ky. 748, 14 S.W.(2d) 205.

The two next claims of error (points 3 and 4) may be considered together. Each relates to admission over objection by defendants of certain testimony involving the defendant Leandro Velarde. A State's wit-

ness, Mrs. John Green, was permitted to testify to certain statements heretofore related as made by the defendant Leandro Velarde at the home of Mrs. Conception Aurelio, on the 29th day of March, 1935, only a few days before the homicide. In overruling a motion to strike same upon the ground among others that it prejudiced other defendants who were not present at the time and place of the alleged conversation the court remarked, "I will take care of these matters later as the occasion arises."

Again, testimony by State's witness Inez Lopez was permitted over objection that defendant Leandro Velarde, half an hour after the homicide, withdrew an ice pick from the bib of his overalls and placed it in the ice chest in his home. The court at the time also denied an application to limit the testimony to Leandro Velarde, saying: "Yes, I will attend to that at the conclusion, remind me of it."

■ These claims of error are without merit for two reasons. Insofar as Velarde is concerned they are immaterial since we are directing his discharge without passing upon the objections to the testimony, even as against him. In so far as the other two defendants are concerned, and contrary to the mistaken claim of defendants' counsel that the trial court never limited the testimony after making the comments indicated, it did so of its own motion at page 579 of the record in the following language, to wit: "The Court: Gentlemen of the Jury, this testimony introduced here to the effect that the defendant Velarde made certain statements regarding the officers at the home of this Mrs. Aurelio, this testimony is to be considered by you only as against Velarde and not as against any of the other defendants; likewise you will not consider the testimony regarding the ice pick, which it is claimed the defendant Velarde took from the bib of his overalls or from his person, at his home after the trouble, except as against the defendant Velarde. You will not consider that as against the other defendants as this occurred after the crowd had dispersed and Velarde had gone to his home."

■ We have carefully examined the claims of error predicated upon the giving and refusal of instructions and find them not well taken. The contention that the jury was not sufficiently instructed that a given defendant could not be convicted upon evidence which showed that some other defendant aided and abetted is without warrant. Untenable, also, is the claim that under the instructions as given the jury might convict *all* defendants upon proof that any one of them killed or aided and abetted in killing the deceased. The instructions may not reasonably be subjected to such a construction and that the jury did not so understand them is demonstrated by their verdicts—seven were acquitted and three convicted.

■ Nor is error present in instruction No. 17 as given by the court in its relation to the defendant Ochoa. The objection is that it submitted the issue whether

Ochoa, himself, *killed* the deceased. It is claimed Ochoa was prejudiced in submission of this issue in this—that there was no evidence whatever that he did so. Of course, the issue of his aiding and abetting in the killing also was submitted.

We heretofore have pointed out the uncertainty in the evidence as to who fired at least one of the shots contributing to the death of Sheriff Carmichael. It was unnecessary for the State to show who actually fired the fatal shot if the proof was sufficient to warrant the inference as to a given defendant that, if he did not fire it, he aided and abetted him who did. Ratliff v. Commonwealth, 182 Ky. 246, 206 S.W. 497; State v. Kukis, 65 Utah 362, 237 P. 476, 477; People v. Petruzo, 13 Cal.App. 569, 110 P. 324; State v. Capaci, 179 La. 462, 154 So. 419; State v. Luster, 178 S.C. 199, 182 S.E. 427; State v. Allison, 200 N.C. 190, 156 S.E. 547; People v. Udwin, 254 N.Y. 255, 172 N.E. 489; Maloy v. State, 8 Ala.App. 73, 62 So. 961; Commonwealth v. Murrano, 276 Pa. 239, 120 A. 106.

We are unable to see error as to the defendant Ochoa in submission of the issue whether he actually killed the deceased in view of our conclusion that the evidence supports an inference that he aided and abetted in such killing. Morally, there never has been a distinction in the degree of culpability. The law long since has ceased to recognize any. All are subject to prosecution, trial, and punishment as principals. Laws 1933, c. 105; Trial Court Rule 35—4439. The aider and abettor may be tried and convicted even though the actual slayer is never apprehended or has been tried and acquitted. Cf. Rule 35—4426. "If A be indicted as having given the mortal stroke, and B and C as present, aiding and assisting, and upon the evidence it appears that B gave the stroke and A and C were only aiding and assisting, the evidence will maintain the indictment, and judgment be given against all the defendants, for it is only a circumstantial variance, as, in law, the mortal blow is the act of all that are present aiding and abetting." 1 Chitty's Crim.Law (5th Ed.) 259. See, also, 1 Wharton's Crim. Law. (12th Ed.) 345-347, §§ 259, 260.

The law having so completely abolished the distinction between principals in the first and second degree and the law being that, even though another fired the fatal shot, it is in contemplation of law Ochoa's act if he aided and abetted, we can see no prejudice in the instruction complained of.

It is next claimed the trial judge exceeded the limits of fair comment in his statement to the jury touching the testimony of certain witnesses. Trial Court Rule 70—106 provides: "Sec. 70—106. The Judge, in so instructing the jury, may make such fair comment on the evidence and the testimony and credibility of any witness as in his opinion is necessary for proper determination of the cause."

In pursuance of the permission granted by said rule, the court made the following comment, to wit: "As I have heretofore

told you in these instructions, you are the sole judges of the credibility of the witnesses who have testified in this case, and of the weight to be given to their testimony. Without expressing any opinion as to the other witnesses who have testified, I feel it proper to call your attention to what I considered the fair and frank testimony of Dee Roberts, Sherman Porter and Hoy Boggess. It seemed to me that these witnesses were endeavoring to tell only what they saw and heard, and I was strongly impressed by their testimony."

The defendants severally objected to this comment as unfair and prejudicial and as taking from the jury a matter within their province to determine, to wit, the credibility of the witnesses. We cannot agree with this contention. The right of the trial judge to indulge in fair comment on the evidence and the testimony and credibility of *any* witness is conferred by Trial Court Rule 70—106, effective July 1, 1934. Prior to that date the action here complained of would have been considered improper. Comp.St.1929, § 70-104; State v. Chavez, 19 N.M. 325, 142 P. 922, Ann. Cas.1917B, 127.

This privilege long has obtained in favor of trial judges in the federal courts. The comment should be neither intemperate nor argumentative. Starr v. United States, 153 U.S. 614, 14 S.Ct. 919, 38 L.Ed. 841. And as a natural corollary, it must be judicial and dispassionate. Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321; Rudd v. United States (C.C.

A.) 173 F. 912. But within the field defined by these admonitions it has been held no abuse of the judge's privilege to express an opinion as to the guilt or innocence of an accused. However, the highest federal court admonishes that comment should be carried to such extent only in exceptional cases. Dunbar v. United States, 156 U.S. 185, 15 S.Ct. 325, 39 L.Ed. 390; United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381. Of course, the jury should always be left with the understanding that it is the sole trier of the facts. In the case at bar the trial judge made this plain to the jury.

We approve the following excellent statement of the true rule to be applied as nearly as may be by the trial judge to individual cases from an opinion by Judge Kenyon in Cook v. United States (C.C.A., 8th Ct.) 18 F.(2d) 50, 52, to wit: "These cases cannot all be harmonized, but we think the line of demarcation between what a court may say to the jury in a criminal case in expressing his opinion on the facts, and what he may not say, is to be drawn between mere expression of opinion not partaking of such argumentative nature as to amount to advocacy, leaving to the jury absolute freedom to determine the facts, and such discussion as amounts to an argument and makes the court in fact an advocate against the defendant. A trial judge is not merely a moderator or umpire; neither is he an advocate."

In the cases of Weiderman v. United States (C.C.A.) 10 F.(2d) 745 and Egan v.

United States (C.C.A.) 22 F.(2d) 776, the comment of the court was much more susceptible to criticism than that here involved and yet in each instance the Circuit Court of Appeals for the Eighth Circuit held it within the limits of permissible comment. See also exhaustive annotation of the whole subject appearing in 78 L.Ed. 387 in connection with the reported case of United States v. Murdock, supra.

Counsel for defendants, citing Hunter v. United States (C.C.A.5th Ct.) 62 F.(2d) 217, also argue that "where the trial court proposes to comment upon credibility of witnesses the rule of fairness requires that such comment should not be limited to one side of the case only." We understand the federal rule to be only that, "if the court feels that it is under duty to review the facts for the purpose of aiding the jury in a correct understanding of them, it must do so in fairness to both litigants, and not state only the facts on one side of the issue." Cline v. United States (C.C.A.,8th Ct.) 20 F.(2d) 494, 496. See, also, O'Shaughnessy v. United States (C.C.A., 5th Ct.) 17 F.(2d) 225; Minner v. United States (C.C.A.,10th Ct.) 57 F.(2d) 506. Here no summation of the evidence was attempted by the trial judge. Our governing rule expressly authorizes the trial judge to make "such fair comment * * * on the testimony of *any* witness as in his opinion is necessary for proper determination of the cause."

The wisdom of fair and judicious comment on the evidence and the testimony of witnesses by the trial judge was a mooted question before annual meetings of the bar association of this state for many years. Finally, following the enactment of Laws 1933, c. 184, concerning adoption by this court of rules relating to pleading, practice, and procedure, upon the recommendation of our advisory committee on rules, composed of eminent members of the bar of this state, and after mature deliberation, we adopted Trial Court Rule 70—106, permitting fair comment on the evidence and the testimony of witnesses. This is the first case challenging fairness of the comment of the trial judge that has come before us since its adoption. If the rule is to have any vitality whatever, comment of the kind here complained of is permissible.

It follows from what has been said that the judgment of the district court must stand affirmed as to the defendants Avitia and Ochoa. As to the defendant Velarde, it is reversed, with a direction to the trial court to set aside the judgment of conviction pronounced upon him and to discharge the prisoner.

It is so ordered.

HUDSPETH, C. J., BICKLEY and BRICE, JJ., and IRWIN S. MOISE, District Judge, concur.