STATE OF NORTH CAROLINA v. MARY HAZEL GRAY

No. 7925SC624

(Filed 18 December 1979)

1. Criminal Law § 89.8— unrelated criminal charges against witness—hope of reward for testimony—cross-examination properly denied

The trial court in a homicide prosecution did not err in refusing to allow defendant to question a witness about unrelated criminal charges against him

for the purpose of showing that he had a hope of reward from his testimony, since the evidence tended to show that no offers of leniency in exchange for the witness's testimony had been made; the State had in fact rejected a plea agreement proposed by the witness's attorney; and the witness's testimony was consistent with the final statement he gave to police two days after the homicide.

2. **Criminal Law § 113.7— homicide—instruction on acting in concert proper**

The trial court in a homicide prosecution adequately charged the jury, upon sufficient evidence, that defendant would be guilty if she and her son, acting together, killed deceased.

APPEAL by defendant from *Thornburg, Judge*. Judgment entered 7 February 1979 in Superior Court, BURKE County. Heard in the Court of Appeals 28 November 1979.

Defendant and her son Robert Campbell were indicted for the murder of Donald Gray, defendant's husband. Under a plea agreement by the terms of which he would testify at defendant's trial and would receive no more than twenty years active sentence, Robert Campbell pled guilty to second degree murder.

Officer Richards of the Drexel police testified for the State that he was called to the Gray home in the early morning hours of 25 June 1978 in relation to a domestic dispute. He had been there at other times for the same reason, and on each occasion defendant had been drinking and her husband had not. Defendant said that her husband had hit her, and she "said she was going to kill Mr. Gray, something had to be done with him." Later that morning Richards saw defendant walking down the street and she told him her husband had assaulted her again. Around 7:30 a.m. Richards was called back to the Gray home, the killing having occurred there by that time.

Subsequently, defendant told the police that Robert had killed her husband because "[w]e no more than walked in the door, and my husband had a twelve gauge shotgun pointed right at me. He told me to get out or he was going to kill me."

Officer Yount testified that he was notified by radio at about 6:55 a.m. that there had been a shooting at the Gray residence. When he entered the house he found defendant, Joe Hallyburton, Robert Campbell and Danny Campbell seated at the kitchen table. Defendant told him that Robert had killed her husband. She told

him that it was self-defense, but he observed no bruises or scratches on her. When he first asked her defendant answered that she had not been assaulted.

Robert Campbell testified that at 6:00 or 6:30 on the morning of 25 June his mother came to the place where he lived and asked him to go with her to Castle Bridge to look for her husband. She said he had beaten her up and she was going to shoot him. Defendant had been drinking "quite a bit." Robert, his younger brother Danny, and his friend Joe Hallyburton went with her. Defendant "said if I didn't shoot him that she would," and "said that if she shot him she wouldn't collect no insurance but if I did, she would."

When they failed to find Gray at Castle Bridge they went to look for him at Bear Campbell's, and defendant said "if he come out the door into the parking lot, to shoot him. She said that if I was to get sent off, it wouldn't be but a couple of years, but it would be worth it to have him gone." Campbell agreed to shoot Gray, but testified he did not mean it; he was only trying to keep his mother from shooting Gray.

Having failed to find Gray at Bear Campbell's, they returned to the Gray residence, and defendant said her husband was not there because she didn't see his car. Robert knew Gray was there, and when he went inside he took with him the gun that had been in the car. Defendant went into the bedroom where Gray was lying down, and they started "fussing." Defendant picked up the twelve gauge shotgun that was lying beside Gray's bed and started running with it. Gray ran after her "and then she started yelling, shoot him, shoot him." Campbell shot him once and defendant "said shoot him, shoot him, he ain't dead." Campbell fired four shots altogether. When Gray fell he was still alive, but defendant, rather than calling an ambulance, instructed the boys as to the story they should tell the police. She told them to say that Gray had held a gun to her head, although this was not true. Robert testified that he had taken the gun into the house intending to give it to Gray "to stop the killing," but he changed his mind when defendant got Gray's gun and was running with it saying "Shoot him, shoot him." Campbell "became excited and shot him."

Joe Hallyburton testified, corroborating Robert Campbell's testimony. When the police came, he told them the story that de-

fendant had told him to tell, but that statement was a lie. He gave the police three false statements and a fourth true one. Defendant's counsel was not allowed to cross-examine Hallyburton about a number of unrelated charges against him which had been dismissed.

Hallyburton's mother, Gail Williams, testified that about a week before the shooting defendant came to her house, and during the conversation there said that her husband had been beating her and she was going to kill him. Georgia Henson testified that she received a call from defendant around 5:30 on the morning of the shooting. Defendant was looking for her husband and said she was going to kill him.

Defendant presented no evidence. She was found guilty of second degree murder and sentenced to 30 years. She appeals.

*Attorney General Edmisten, by Associate Attorney J. Chris Prather, for the State.*

*Mitchell, Teele, Blackwell & Mitchell, by W. Harold Mitchell and H. Dockery Teele, Jr., for defendant appellant.*

ARNOLD, Judge.

[1] Defendant contends that the trial court erred in refusing to allow her counsel to question the witness Hallyburton about unrelated criminal charges against him, for the purpose of showing that he had a hope of reward from his testimony. Before ruling upon the defendant's request to so examine Hallyburton, the trial court held a lengthy voir dire. It revealed that a number of the charges against the witness had been dismissed as frivolous by the trial judges before whom they were brought, dropped by the prosecuting witnesses, or dismissed by prosecutors for insufficient evidence. On the remaining felony charges no offers of leniency in exchange for the testimony had been made, and in fact the State had rejected a plea agreement proposed by Hallyburton's attorney. Upon this evidence the court denied defendant's request, and we find no error in this denial. We are aware of this court's holding in *State v. Biggerstaff*, 16 N.C. App. 140, 191 S.E. 2d 426 (1972), that evidence of unrelated criminal charges which had been dropped should have been admitted to show that the witness "was in such a position that she might have felt it ad-

visable to curry favor with the State." *Id.* at 145, 191 S.E. 2d 429. However, the evidence presented on voir dire in the present case gave no indication that the witness had received, or hoped for, favors from the State. Hallyburton's testimony was consistent with the final statement he gave to police two days after the shooting, and with the testimony of Robert Campbell. He testified that his attorney sought a plea bargain "wanting them to guarantee me probation if I testified, but they wouldn't deal, so I'm going to testify anyway." We note that any witness under indictment is in a position where it may appear to him "advisable to curry favor with the State," and yet our Supreme Court has expressly held that for purposes of impeachment a witness may not be cross-examined as to whether he has been indicted on an unrelated criminal offense. *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971).

Defendant cannot complain of purported inadequacies in the charge on self-defense, since there is no evidence in this case to support a charge on self-defense. See *State v. Bailey*, 4 N.C. App. 407, 167 S.E. 2d 24 (1969). The charge given in error could only have worked to defendant's benefit.

[2] Defendant contends that the trial court erred in charging the jury on "acting in concert" and failing to charge on "aiding and abetting." Defendant has failed to show, however, how this alleged error is prejudicial.

One who actually participates in the deed is a principal in the first degree (acting in concert), and one who is actually or constructively present and aids in the commission of the crime is a principal in the second degree (aiding and abetting). *State v. Allison*, 200 N.C. 190, 156 S.E. 547 (1931). It has long been recognized in North Carolina that the distinction between principals in the first and second degree is a distinction without a difference, and that both are equally guilty. *State v. Benton*, 276 N.C. 641, 174 S.E. 2d 793 (1970); *State v. Allison, supra*; *State v. Whitt*, 113 N.C. 716 (1893). The trial court adequately charged the jury, upon sufficient evidence, that defendant would be guilty if she and Robert Campbell, acting together, killed the deceased. We find no prejudicial error in the charge.

The defendant received a fair trial, free from prejudicial error.

No error.

Judges CLARK and ERWIN concur.